# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-1723 & 09-2107

SANDY ROE, as Administrator of the Estate of
EDWARD J. ROE, Deceased, et al.,

*Plaintiffs-Appellants*,
*Cross-Appellees*,

*v.*

WILLARD O. ELYEA, in his individual capacity,

*Defendant-Appellee*,
*Cross-Appellant*,

and

MICHAEL PUISIS, in his official capacity as Medical
Director of the Illinois Department of Corrections,

*Defendant-Appellee*.

Appeals from the United States District Court
for the Central District of Illinois.
No. 3:06-cv-03034-HAB-CHE—**Harold A. Baker**, *Judge*.

ARGUED JANUARY 22, 2010—DECIDED JANUARY 28, 2011

Before RIPPLE and ROVNER, *Circuit Judges*, and ST. EVE, *District Judge*.*

RIPPLE, *Circuit Judge*.   Edward Roe, Anthony Stasiak, Timothy Stephen and Jonathan Walker are current and former inmates of the Illinois Department of Corrections ("IDOC") who were diagnosed with hepatitis C during or prior to their time in IDOC custody. After unsuccessful attempts to obtain certain medical services for their disease while incarcerated, they brought this action against Dr. Willard Elyea, the former Medical Director of IDOC.[1] The plaintiffs alleged that the diagnostic and treatment protocols for IDOC inmates with hepatitis C displayed deliberate indifference to their serious medical needs and thus violated the constitutional prohibition on cruel and unusual punishment. They sought relief under 42 U.S.C. § 1983. After a jury awarded substantial compensatory and punitive damages to the plaintiffs, the defendants moved for judgment as a matter of law and, in the alternative, for remittitur of the award. The district court granted in part and denied in part the motion. The parties now cross-appeal. For the

---

* Honorable Amy St. Eve, District Judge for the Northern District of Illinois, is sitting by designation.

[1] The plaintiffs brought the action against Dr. Elyea in both his official and his personal capacity. At the time of trial, Dr. Elyea had been succeeded by Dr. Michael Puisis as the Medical Director of IDOC. Dr. Puisis was substituted as the defendant for the official capacity claims for injunctive relief pursuant to Fed. R. Civ. P. 25(d). *See* R.110 at 6-7.

reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Each of the plaintiffs claims that, during his incarceration in IDOC, he was refused or delayed treatment for hepatitis C and that he suffered some further injury as a result. The plaintiffs contend that Dr. Elyea, the IDOC Medical Director from 2002-2007, knowingly instituted a protocol for the diagnosis and treatment of hepatitis C that fell below constitutionally acceptable standards of medical care for inmates. To facilitate an understanding of the specific claims, we first discuss the record evidence about the disease and the IDOC response to it and then discuss each plaintiff's particular medical situation. The only record evidence regarding the disease, as a general matter, comes from the Federal Bureau of Prison ("FBOP") Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis (the "Guidelines")[2] and the testimony of Dr. Elyea himself.

---

[2] The FBOP Guidelines have had several iterations. For our purposes, however, we rely primarily on the Guidelines published in February 2003 and note when we are referencing the October 2005 update. *See* Trial Exs. 3 & 4.

### 1. Hepatitis C Diagnosis and Treatment Recommendations

Hepatitis C is a disease caused by a virus known as HCV. It has the potential to affect liver functioning. The HCV virus has six genotypes, the first of which is the prevalent form in the United States. HCV is transmitted by blood-to-blood contact, including, with some frequency, during tattooing or other shared-needle activities. In the acute phase, individuals may have a variety of symptoms that are only rarely severe and may include jaundice, nausea, anorexia and malaise. HCV infection can resolve spontaneously from the acute phase, but an estimated 50-85% of infected persons develop chronic infection. Even among patients with chronic hepatitis C, the majority are asymptomatic. One-third of persons with chronic HCV infection show no evidence of liver disease. However, some 10-15% of infected persons show progressive fibrosis that leads to cirrhosis. Dr. Elyea testified at trial that there is no reliable way of predicting which chronic HCV patients will develop cirrhosis. R.110 at 164. However, according to the FBOP Guidelines upon which IDOC policy purportedly was based, known risk factors for disease progression include high levels of alcohol consumption, male gender, older age and simultaneous infection with other viruses such as HIV or HBV (the hepatitis B virus). As of 2003, viral load (the degree of virus present in the bloodstream of a particular individual at a particular time) and the particular genotype of HCV were not

thought to affect the risk of progression of disease.[3]

When the disease causes liver failure, a liver transplant may be necessary. In addition to the risks of cirrhosis itself, liver cancer in individuals with cirrhosis develops at a rate of about 1-4% per year. These potentially serious conditions frequently develop in infected individuals up to twenty or thirty years after initial infection.

Because of its usual means of transmission, HCV is a fairly common virus in the prison population, and the FBOP Guidelines prescribe a specific course of diagnosis and treatment in federal facilities. The FBOP Guidelines direct that a "baseline" evaluation should be conducted for all inmates diagnosed with chronic hepatitis C. Trial Ex. 3 at 39-40. That evaluation should include "at least" a "[t]argeted history and physical examination to evaluate for signs and symptoms of liver disease," a variety of blood tests, including those for ALT and AST liver enzyme levels "and further diagnostic evaluations as clinically warranted," a renal function assessment,

---

[3] The 2003 FBOP Guidelines state: "Chronic HCV infection has an unpredictable course that is frequently characterized by fluctuations in ALT levels that may or may not be associated with significant liver disease. Approximately one-third of persons with chronic HCV infection have no evidence of liver disease." Trial Ex. 3 at 39. "The degree of ALT elevation does not strongly correlate with the risk of disease progression, but persons who develop cirrhosis are more likely to have marked elevations in serum ALT levels." *Id.*; *see also* Trial Ex. 4 at 28 (2005 Guidelines) ("The greater the ALT level, the more likely it is that the person has significant liver disease . . . .").

and other blood tests and vaccinations. *Id.* at 39-40. The Guidelines further recommend that inmates with chronic infection should be monitored periodically in chronic care clinics, with the frequency of monitoring to be based on "patient-specific factors." *Id.* at 41.

A variety of tests may be used to diagnose and evaluate the progress of disease and determine the appropriateness of treatment. Although blood tests can reveal significant and useful information such as viral load, enzyme responses of the liver and the genotype of the virus, liver biopsy is ultimately the only method discussed in the Guidelines to determine the effect of the disease on the liver. *See id.* at 42. The appropriateness of treatment with antiviral therapy depends on the extent of the disease. Biopsies are not appropriate in all cases, however, and the Guidelines offer some direction in determining who should be a candidate. When an inmate's initial evaluation shows normal ALT levels, the Guidelines direct that the test should be repeated "several times over the next 2 to 12 months." *Id.* at 42. Persistently normal results are likely indications that there is no marked liver disease. *Id.* However, even when ALT levels are in the normal range, the Guidelines caution that a ratio of AST/ALT greater than one "may indicate underlying liver disease and warrant further evaluation." *Id.* at 42. When ALT levels are "minimally elevated," that is, less than twice normal levels, patients may have mild liver disease but are at low risk of rapid disease progression. *Id.* at 43. The Guidelines recommend reevaluation in three to six months and note that the "decision to obtain a liver biopsy in these inmates

should be made on a case-by-case basis." *Id*. When ALT is twice normal or greater, the Guidelines direct that the tests be repeated at least twice over a six-month period. "Inmates with persistent elevations in ALT levels > twice normal should be referred directly for liver biopsy unless antiviral therapy is contraindicated." *Id*.[4] Finally, "[i]nmates with suspected compensated cirrhosis based on clinical and laboratory parameters should be either referred directly for liver biopsy or treated empirically (without biopsy confirmation)." *Id.*

After chronic HCV infection is confirmed and the levels indicate that liver biopsy is appropriate, the Guidelines direct that certain inmates should receive treatment in the form of antiviral therapy, a combination of pegylated interferon and ribavirin. *Id.* at 45-47. Inmates whose biopsies reveal "portal or bridging fibrosis and at least moderate inflammation and necrosis" are recommended to receive antiviral treatment. *Id.* at 44. Within that group, "[p]ersons with severe liver disease, including compensated cirrhosis, are at higher risk of developing liver complications and should therefore be priority candidates for treatment." *Id*. Dr. Elyea emphasized in his testimony at trial that the long-term efficacy of antiviral therapy is not known and that it is not always well-tolerated by patients. *See* R.110 at 167-70.

---

[4] The Guidelines list specific contraindications for treatment. They include active substance abuse, co-infections with HBV or HIV and latent tuberculosis. *See* Trial Ex. 3 at 48-49.

The Guidelines also specifically direct that HCV geno-type should be determined prior to ordering antiviral therapy because genotypes 2 and 3 not only have a greater rate of positive response to treatment, but also may be treated with only a twenty-four-week course of the drugs, while genotype 1 requires forty-eight weeks.[5]

Finally, the FBOP Guidelines segregate two groups: "Detention center/short-term inmates" and "Long-term (sentenced) inmates." Trial Ex. 3 at 41. The former group "should ordinarily not be started on antiviral therapy," and, instead, "[t]reatment decision should be deferred until the inmate is sentenced and redesignated or re-leased." *Id.* Sentenced inmates should be considered for treatment in light of a variety of factors. Among those factors is that the "best markers for determining who should be offered antiviral therapy" are "[t]he presence of moderate to severe fibrosis and inflammation and necrosis on liver biopsy." *Id.* at 42.

The cost of antiviral therapy to reduce the viral load was, at the time of trial, $15,000-$20,000 per year per patient. R.110 at 99.

## 2. IDOC Protocol

No documentary evidence was presented at trial of an independent IDOC policy for inmates with chronic hepati-

---

[5] Indeed, the 2005 version of the Guidelines indicates that some patients with genotype 2 or 3 may respond fully to antiviral therapy in as little as twelve weeks. *See* Trial Ex. 4 at 31.

tis C infection. Instead, Dr. Elyea testified as to the requirements for treatment in IDOC facilities. The plaintiffs themselves also testified about what their individual treating physicians in the IDOC system told them, and they submitted into the record responses received to grievances filed requesting treatment.

Dr. Elyea stated that, in order to establish a consistent treatment plan that covered all inmates, the decision was made to limit follow-up testing and treatment to those individuals who could complete a course of treatment while still incarcerated. *See* R.110 at 109. In order to allow for a work-up and for a forty-eight-week period of treatment, IDOC would not consider further testing, biopsy or therapy unless an inmate had *at least* eighteen months[6] remaining in his sentence. According to Dr. Elyea, this limitation was necessary in order to ensure that inmates received an uninterrupted course of therapy.

---

[6] There was some dispute about the length of time an inmate had to have remaining on his sentence to receive testing and treatment. More than one response to an inmate grievance indicates that the policy required at least *two years* remaining on a sentence before an inmate would be considered for follow-up testing and treatment, and more than one inmate testified that this was his understanding of the policy. *See* Trial Ex. 5 (Memorandum from Dave Huffman, Health Care Unit Administrator, in response to Mr. Walker's grievance (Dec. 29, 2003)); Trial Ex. 5 (Memorandum from Dave Huffman, Health Care Unit Administrator, in response to Mr. Stephen's grievance (Apr. 19, 2004)); R.110 at 60 (Mr. Stasiak), 77 (Mr. Stephen).

Although not noted in the 2003 Guidelines, the 2005 Guidelines indicate that interrupted antiviral therapy for hepatitis C places inmates "at risk for a number of undesirable outcomes, including treatment failure . . . and adverse effects from medications if the inmate does not receive the required laboratory and clinical monitoring upon release or transfer." Trial Ex. 4 at 26. Dr. Elyea testified that the blanket sentence-based policy afforded the facilities' health care vendors six months to complete a pre-treatment work-up and then one year to complete treatment, regardless of genotype. R.110 at 90.

Dr. Elyea repeatedly testified that the treatment protocol was consistent with the FBOP Guidelines, and, indeed, counsel for Dr. Elyea contended that the IDOC policy was more generous to inmates than the FBOP Guidelines required. He noted that an individual could be an unsentenced detainee in the federal system for as much as two years and the Guidelines recommend deferring treatment until sentencing or release. In his view, because the Guidelines sanctioned a delay of treatment decisions for at least that period for some detainees, IDOC policy was consistent with the Guidelines.

### 3. The Plaintiffs' Specific Claims

#### a. Mr. Roe

In 1991, during an incarceration prior to Dr. Elyea's term as Medical Director, Mr. Roe was diagnosed with hepatitis C, though his records suggested infection since the 1970s. *See* Trial Ex. 5 (Grievance of Mr. Roe at 2, Mar.

11, 2004); Doc. 1-279.[7] He was released from custody in 2002. During Dr. Elyea's term, Mr. Roe was incarcerated for two months in 2003 and a little more than eight months, from January 19, 2004 to October 1, 2004. He again was incarcerated from July 2007 until his death in June 2008. During his 2002 incarceration, Mr. Roe had liver enzyme testing and genotype testing. His lab results showed his ALT and AST levels at more than twice normal.[8] They further revealed that his HCV genotype was 3a, and thus, according to the FBOP guidelines in place in 2003, he would have been a candidate for the shorter twenty-four-week course of antiviral therapy. Labs were repeated in 2003 and 2004, each showing elevated liver enzyme levels. Indeed, including the 2002 test, four of the five tests included in the record showed not only ALT levels greater than twice normal, but also an AST/ALT ratio of greater than one,[9] which the Guide-

---

[7] The trial exhibits, particularly the inmate medical and grievance records, are not bound and were not bate-stamped consistently. If a particular document was stamped, we have used the notation "Doc." and a stamp number to identify the document. When no numbering is available, we have referred to the general number of the trial exhibit with which a particular document was admitted and then have described the document by content and date.

[8] *See* Doc. 1-257, LabCorp Rpt., 6/8/02 (showing ALT and AST of 100 each, reference range 0-40).

[9] *See* Doc. 1-306, LabCorp Rpt., 8/27/03 (showing ALT of 72 and AST of 96, reference range 0-40 for each); Doc. 1-308, LabCorp

(continued...)

lines identify as an indicator of "underlying liver disease" even when ALT levels are within the normal range, *see* Trial Ex. 3 at 42.

During his 2004 incarceration, Mr. Roe was misdiagnosed and treated briefly for tuberculosis. *See* Doc. 1-283 (noting the repeated test results). Tuberculosis is a contraindication for antiviral therapy according to the Guidelines. After repeat testing revealed the incorrect diagnosis, Mr. Roe's tuberculosis treatment was discontinued on March 6, 2004, just under seven months from his scheduled release date.

During and prior to his 2004 incarceration, Mr. Roe was not considered a candidate for biopsy or antiviral therapy. He also received no treatment following his release. When he returned to prison in 2007, after Dr. Elyea's term had ended but while his policy was still in place, he again received no further testing until one week before trial, when his liver was biopsied. He was, according to the court, "visibly quite ill with a distended abdomen at the trial." R.88 at 9. He died three months later, apparently from cirrhosis. R.63-64.

---

[9] (...continued)
Rpt., 1/21/04 (showing ALT of 98 and AST 105, reference range for each 0-40); Doc. 1-313, LabCorp Rpt., 4/21/04 (showing ALT and AST of 182 each, reference range 0-40); Doc. 1-315, LabCorp Rpt., 7/23/04 (showing ALT of 162 and AST 182, reference range for each 0-40).

### b. Mr. Walker

At the time of trial, Mr. Walker had been incarcerated since 1995 and had a scheduled release date in 2011. He was diagnosed with hepatitis C in October 2003, but received no treatment until 2007, after the lawsuit had begun. From 2003 through 2005, several lab reports indicated at least minimal elevation in his ALT and AST levels; at times, the elevation was considerably higher than twice normal levels. *See, e.g.*, Docs. 1-166, 1-176, 1-228. In December 2003, he filed a grievance concerning his lack of treatment. The Health Care Unit Administrator, Dave Huffman, responded that, in order to qualify for treatment, Mr. Walker had to be "on the Hepatitis C chronic clinic for 1 year and meet specific lab test results . . . . After 1 year, if he meets the criterion, treatment will be started because he will still have more than 1 year left to serve." Doc. 1-156. Mr. Walker again grieved the lack of treatment in June 2004, and his grievance was again denied because he did not meet set IDOC treatment criteria.[10]

---

[10] This second denial stated:

> I/M is on the chronic clinic appropriate for his disease process. I/M has not met the criteria for treatment as of yet. His medical issue is a disease process that progresses very slowly. Just because a person has the disease that person has to meet treatment criteria.
>
> . . . .

(continued...)

Mr. Walker testified that, although his enzymes were checked periodically, he received no treatment for his HCV infection until he was deposed in connection with the present action in 2007. He was given a liver biopsy and a week later began a course of treatment, after which the virus was undetectable in his body. R.110 at 30. He also testified that, prior to receiving treatment, he suffered from a number of symptoms, including nose bleeds, headaches and pain, all of which had stopped after treatment. *Id.* at 31-32.

### c. Mr. Stasiak

While Dr. Elyea was IDOC Medical Director, Mr. Stasiak was incarcerated from August 2003 through December 2004. He testified that he was diagnosed with hepatitis C in January 2004 and made numerous requests for a liver biopsy and treatment. He complained of symptoms he attributed to his infection, but one medical progress note stated that his claimed symptom of abdominal pain was "not due to Hepatitis [and was] possibly musculoskeletal in nature." Doc. 1-128. Mr. Stasiak's enzyme levels were taken numerous times from January through December of 2004, with results

---

[10] (...continued)

. . . . It is important to remember that this disease process was caught by the I/M because of his own behaviors prior to incarceration. The Medical Director is monitoring the disease process appropriately.

Doc. 1-160.

varying from more than twice normal to within the normal range.[11]

Mr. Stasiak complained to his prison physician that he was not receiving treatment for his HCV infection in February 2004. At that time, the physician noted his "out date" was only ten months away, and, therefore, he would "not meet criteria" for treatment during his incarceration. Doc. 1-125. In July 2004, a separate note indicated "liver enzyme levels ↑. Minimum stay is needed at least of 1 year." Doc. 1-130 (emphasis in original). Mr. Stasiak received no treatment prior to his release.

### d. Mr. Stephen

During Dr. Elyea's tenure, Mr. Stephen was incarcerated for seven months in 2004, seven months from 2005-2006 and two months in 2007. He was diagnosed with hepatitis C during his 2004 incarceration. Throughout his periods of incarceration in 2004 and 2005-2006, his

---

[11] In mid-January 2004, he had an ALT of 91, more than twice normal, and an AST of 54, minimally elevated. Doc. 1-121. Later that month, his ALT had risen to 112 and his AST to 62. Doc. 1-153. Handwritten notes in May ambiguously include the notation "↑," although it is not clear whether this indicates that the values again went up or were simply elevated. Doc. 1-128. When tests were repeated in August 2004, however, his values had fallen to an ALT of 53 and an AST of 30. Doc. 1-132. In September, his values were an ALT of 69 and an AST of 40. Doc. 1-155. By October, his ALT had fallen to 6, and no AST value was reported. Doc. 1-136.

relevant liver enzyme levels were checked numerous times and were always above twice normal.[12]

Medical progress notes written in July 2004 noted that, despite his highly elevated enzyme levels, "liver biopsy and treatment cannot be accomplished. He needs to stay at least 12-15 months here." Doc. 1-63 (emphasis in original).

No medical records were submitted from Mr. Stephen's 2007 incarceration. According to his trial testimony, he suffered a number of symptoms, including abdominal pain and swelling. After his release, he subsequently was scheduled for treatment outside of prison and, at that time, had three liters of fluid removed from his abdomen. R.110 at 73.

## B. District Court Proceedings

The plaintiffs filed the present claim alleging constitutionally inadequate medical care in IDOC facilities. They named Dr. Elyea and several other officials as defendants. The plaintiffs sought, but were denied, class certification. The defendants later sought summary judgment, which was granted in part and denied in part. Specifically, the district court entered judgment for

---

[12] *See* Doc. 1-99 (ALT 288, AST 204 in Feb. 2004); Doc. 1-54 (ALT 310, AST 256 in early Mar. 2004); Doc. 1-102 (ALT 200, AST 186 in late Mar. 2004); Doc. 1-75 (AST 416, ALT 389 in Aug. 2005); Doc. 1-104 (ALT 329, AST 267 in Sept. 2005); Doc. 1-105 (ALT 157, AST 157 in Nov. 2005).

the defendants on claims for injunctive relief by those plaintiffs no longer in IDOC custody and on claims barred by the statute of limitations. R.27. The court also dismissed the official defendants other than Dr. Elyea and his successor. The damages claims of the four plaintiffs arising during Dr. Elyea's tenure proceeded to trial. At trial, the plaintiffs presented no independent expert medical testimony in support of their claims; instead, they relied only on the FBOP Guidelines, their IDOC medical records, their own testimony and Dr. Elyea's adverse testimony.

At the close of the plaintiffs' evidence, the defense made its first motion for judgment as a matter of law, arguing that sovereign immunity barred the suit. The motion was denied. The defense then recalled Dr. Elyea to the stand as part of its case-in-chief. After his further testimony, the defense rested, and the jury was excused.[13] Dr. Elyea then again moved for judgment as a matter of law, this time citing qualified immunity among his objections. The motion again was denied, and the case was submitted to the jury. On February 15, 2008, the jury returned its verdict in favor of the plaintiffs, awarding compensatory damages of $20,000 and punitive damages of $2 million to each plaintiff, for a total award of $8,080,000.

On March 4, 2008, Dr. Elyea filed a renewed motion for judgment as a matter of law. He further requested, as

---

[13] Although the pre-trial order identified eight additional witnesses for the defense, none testified at trial. *See* R.36, Ex. C.

alternative relief, a new trial or remittitur of the award.
On February 18, 2009, the district court issued an opinion
and order addressing Dr. Elyea's motion. The court
vacated the judgment in favor of Mr. Stephen, Mr. Stasiak
and Mr. Walker. It concluded that insufficient evidence
supported the verdict in their favor. We shall discuss the
specific failings identified by the district court in the
context of our discussion of their contentions on appeal.
With respect to the remaining plaintiff, Mr. Roe (or, more
properly at that stage of the litigation, his estate), the
district court denied the defendant's motion on the issue
of liability and on the issue of compensatory damages,
sustaining the jury's verdict on those matters. The court
granted the defendant's motion, however, with respect
to the punitive damages award and ordered conditional
remittitur of the $2 million award to $20,000, or, at the
Estate's election, a new trial on punitive damages. The
order stated that the Estate "shall file a pleading within
14 days of the entry of this order stating whether [it]
accepts or rejects the proposed remittitur of the jury's
punitive damage award. Failure to file said pleading
shall be deemed an acceptance of the remittitur." R.88
at 20. The judgment entered the following day stated
that the 2008 judgment, based on the jury's verdict,
was "still in effect as to Plaintiff Roe." R.89.

   The Estate of Mr. Roe did not respond to the condi-
tional remittitur order. On March 18, 2009, the court
entered an amended judgment clarifying the award of
costs and continued to note that the prior judgment was
"still in effect as to Plaintiff Roe," despite the fact that
more than fourteen days had passed from the conditional

remittitur order without a response from Mr. Roe's Estate. R.96. The same day, the plaintiffs filed their notice of appeal. The notice purported to challenge the rulings of the court as to remittitur of Mr. Roe's award and liability of Dr. Elyea with respect to the remaining plaintiffs.

On March 24, 2009, the court entered a further order confirming that Mr. Roe's Estate had failed to respond and was deemed to have accepted the remittitur. The court also "clarifie[d] that Defendant Puisis, who was substituted for Defendant Elyea in his official capacity after the jury trial for purposes of injunctive relief only, [was] terminated" because "no injunctive relief is available in this case." R.101 at 2.

## II

## DISCUSSION

The parties have filed cross-appeals of the district court's judgment. Mr. Stephens, Mr. Stasiak and Mr. Walker appeal the district court's entry of judgment as a matter of law against them following the jury verdict in their favor. The Estate of Mr. Roe challenges the remittitur. Dr. Elyea appeals the denial of judgment as a matter of law on the claims related to Mr. Roe and challenges this court's jurisdiction over the plaintiffs' appeal.

### A. Jurisdiction

Dr. Elyea makes two jurisdictional objections to the plaintiffs' appeal. Before turning to the substantive con-

tentions each party presents, we address each of these contentions.

### 1. Premature Notice of Appeal

Dr. Elyea contends that this court lacks jurisdiction over the plaintiffs' appeal in its entirety because the plaintiffs' March 18, 2009 notice of appeal was filed prematurely. The appeal was taken following the February 19, 2009 decision and order, which announced the conditional remittitur. Although that order specified that fourteen days of inaction by Mr. Roe's Estate "shall be deemed an acceptance," R.88 at 20, of the remittitur, the court did not enter an amended judgment to that effect until March 24, 2009. According to Dr. Elyea, the February 19, 2009, judgment was not final and appealable.

"An order that offers a choice between a remitted award and a new trial is not a final decision . . . ." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 739 (7th Cir. 2004). Nevertheless, Federal Rule of Appellate Procedure 4(a)(2) provides that an appeal taken "after the court announces a decision or order—but before the entry of the judgment or order—is treated as filed on the date of and after the entry." That is, a prematurely filed notice will "spring forward" to the date on which a judgment technically has become final, thus effectively conferring jurisdiction on the court of appeals at the time that the final judgment is entered. *A. Bauer Mech., Inc. v. Joint Arbitration Bd.*, 562 F.3d 784, 789 (7th Cir. 2009); *see also Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 701 (7th Cir. 2004) ("[O]nce the decision is announced, a premature

notice of appeal lingers until the final decision is entered.").

Dr. Elyea contends that Rule 4(a)(2) cannot be applied to this case because the order that preceded the appeal offered Mr. Roe's Estate a choice between alternatives and was, therefore, an inherently non-final decision. That is, in his view, an issue was left to be decided and, therefore, the prematurity was more than the mere technicality that Rule 4(a)(2) authorizes courts to overlook.

We decline to adopt Dr. Elyea's position. When the district court entered its February 18, 2009 order, it articulated its decision with respect to the remaining issues in the case. More specifically, the district court's consideration of the request for a remittitur had concluded and, although Mr. Roe's Estate had an opportunity to respond, the district court already had dictated the consequences of either response the Estate could elect. Given these unequivocal statements in the conditional order, when the fourteen days specified in the order passed, the Estate appears to have concluded that the award had been remitted and there would be no new trial on damages. *See* R.97 at 1 (Notice of Appeal stating that the order appealed from "remitt[ed] the punitive damages assessed by the jury in favor of Plaintiff Roe"). The March 24, 2009 order of the district court itself confirms that the Estate was correct to conclude that the matter already had been decided, despite the fact that, as a technical matter, it was that subsequent order that made the court's previously announced decision final. *See* R.101.

Under the circumstances of this case, the Estate's "belief" that the February 19, 2009 "order also disposed of its

claims was reasonable." *A. Bauer Mech.*, 562 F.3d at 789.
For all intents and purposes, the district court had
"announce[d]" its decision, Fed. R. App. P. 4(a)(2), on
every pending matter in the case. Dr. Elyea's conten-
tion to the contrary elevates form over substance, the
precise problem that Rule 4(a)(2) gives this court the
authority to correct.

We also are not persuaded by Dr. Elyea's quotation of
the Supreme Court's decision in *FirsTier Mortgage Co. v.
Investors Mortgage Insurance Co.*, 498 U.S. 269 (1991), for
the proposition that "Rule 4(a)(2) permits a notice of
appeal from a nonfinal decision to operate as a notice of
appeal from the final judgment only when a district
court announces a decision that *would be* appealable if
immediately followed by the entry of judgment." *Id.* at 276
(emphasis in original). Dr. Elyea believes that, because
our precedent holds that the conditional order itself is
not appealable, *FirsTier* requires us to determine that
Rule 4(a)(2) cannot save the prematurely filed notice.
Read in context, however, the quoted language from
*FirsTier* merely clarifies that some notices of appeal filed
long before a decision on the merits are so premature
that they are not saved by the rule; specifically, the Court
references notices of appeal filed after "a discovery
ruling or a sanction order under Rule 11," and states that
the losing party's "belief that such a decision is a final
judgment would *not* be reasonable." *Id.* (emphasis in
original). We do not think this language applies to cases
such as this, where the merits of the entire case ef-
fectively are resolved by a particular ruling. We further
note that Mr. Roe's Estate never has challenged the non-

final conditional order itself, only the remittitur that resulted from its inaction following the conditional order. *FirsTier* does not affect our conclusion that the Estate's mistaken belief about the automatic effectiveness of the conditional order was reasonable and that its error is correctable by this court under Rule 4(a)(2). Accordingly, our jurisdiction over the plaintiffs' appeals in their entirety is not affected by the premature filing.

### 2. Remittitur

Dr. Elyea next asserts that Mr. Roe's Estate may not challenge the remitted award itself. Although such review initially was sought by the Estate, it conceded that a remittitur order is unreviewable in its reply brief and at oral argument. Its concession is well-taken. *See Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649-50 (1977) (per curiam) (noting that a plaintiff may not appeal a remittitur that he has accepted, even "under protest"); *Republic Tobacco*, 381 F.3d at 739 ("[I]f a plaintiff agrees to accept the reduced judgment in the trial court, that plaintiff may not later argue that the jury's verdict should be reinstated on appeal."); *Ash v. Georgia-Pac. Corp.*, 957 F.2d 432, 437 (7th Cir. 1992) ("An order setting the case for a new trial is not final, and hence not appealable under 28 U.S.C. § 1291. An election between that new trial and a sum certain is final, but a party may not appeal from a judgment to which it consents. One who accepts a remittitur in lieu of a new trial has consented, and so may not appeal."). We therefore affirm the district court's order remitting the punitive damages awarded to Mr. Roe.

**B. Standard of Review**

Mr. Stephen, Mr. Stasiak and Mr. Walker appeal the district court's entry of judgment as a matter of law to Dr. Elyea following the jury verdict and award of damages in their favor, and Dr. Elyea appeals a denial of the same with respect to the claims made by Mr. Roe. As we recently have stated, we review a district court's ruling on a motion for judgment as a matter of law

> de novo, "examining the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury's verdict." *Walker v. Bd. of Regents of the Univ. of Wis. System*, 410 F.3d 387, 393 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002)). In making this determination, we are mindful of the fact that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

*Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866 (7th Cir. 2009) (parallel citations omitted) (modification in original). Further, we "must disregard all evidence favorable to the moving party that the jury [was] not required to believe." *Reeves*, 530 U.S. at 151. The jury's verdict must stand "unless the moving party can show that 'no rational jury could have brought in a verdict against

[him].'" *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 926 (7th Cir. 2004) (modification in original) (quoting *E.E.O.C. v. G-K-G, Inc.*, 39 F.3d 740, 745 (7th Cir. 1994)). We begin with a discussion of the law of deliberate indifference and then turn to the plaintiffs' specific claims.

### C.  Deliberate Indifference

As we recently have stated,

> The Eighth Amendment's prohibition against cruel and unusual punishment, which embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," prohibits punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle* [*v. Gamble*], 429 U.S. [97,] 102 [(1976)] (quotation marks omitted). It thus requires that the government provide "medical care for those whom it is punishing by incarceration." *Id.* at 103. The Eighth Amendment safeguards the prisoner against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* Accordingly, "deliberate indifference to serious medical needs" of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution. *Id.* at 104.

*Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (parallel citations omitted).

A successful deliberate indifference claim is comprised of both an objective and a subjective element. *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994). First, an inmate must demonstrate that, objectively, the deprivation he suffered was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). In the medical care context, this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). A medical need is considered sufficiently serious if the inmate's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Notably, "[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Second, an inmate must establish that prison officials acted with a "'sufficiently culpable state of mind'" to support liability under § 1983. *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834). Although negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care. *Walker*, 293 F.3d at 1037. "[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno*, 414 F.3d at 653.

Applying the above to prison medical professionals, we have stated that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (internal quotation marks omitted). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (internal quotation marks omitted). The burden is high on a plaintiff making such a claim: "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). However, a successful plaintiff need not "show that he was literally ignored" in his demands for medical treatment, and a defendant's showing that a plaintiff received "*some*" treatment does not resolve the issue conclusively if the treatment was "blatantly inappropriate." *Greeno*, 414 F.3d at 653-54 (emphasis in original) (internal quotation marks omitted). Finally, the Eighth Amendment "protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original).

**D. Qualified Immunity**

Dr. Elyea submits that, even if the plaintiffs are able to establish a violation of a constitutional right to medical treatment for their HCV infection and resultant conditions, that right was not "clearly established" at the time that he acted. Therefore, in his view, the district court erred in denying him the defense of qualified immunity.

In actions under 42 U.S.C. § 1983 alleging violations of constitutional rights, qualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conduct was not clearly established at the time he acted. *Alexander v. City of Milwaukee*, 474 F.3d 437, 446 (7th Cir. 2007).

Based on our earlier discussion of the law governing deliberate indifference claims, we have no difficulty in concluding that the right to adequate medical care and treatment of conditions of inmates was clearly established at all times during the relevant actions in this case. Nor do we understand Dr. Elyea to contend otherwise. Instead, his contention is that, with respect to the *particular* condition and *particular* treatment at issue here, any unlawfulness in the IDOC's policy was not apparent to him when he implemented the hepatitis C treatment rules in effect in 2003. He relies on two cases that take note of similar waiting-period policies for hepatitis C treatment in other state correctional systems as evidence that "reasonable people in [Dr. Elyea's] position would [not] have agreed that the Illinois policy was unconstitutional." App. R.32 at 1; *see McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004) (New York); *Bender v. Regier*, 385 F.3d 1133 (8th Cir. 2004) (South Dakota).

In determining whether a right was "clearly established" at the time of an official action, we must look at the right violated in a "particularized" sense, rather than "at a high level of generality." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). As the Supreme Court recently has emphasized, however, "there is no need that 'the very action in question [have] previously been held unlawful.'" *Safford Unified Sch. Dist. v. Redding*, ___ U.S. ___, 129 S. Ct. 2633, 2643 (2009) (modification in original) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Outrageous conduct obviously will be unconstitutional. *Id.* "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" *Id.* (modification in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The basic question is whether the state of the law at the time that Dr. Elyea acted gave him reasonable notice that his actions violated the Constitution. The focus of our inquiry must be the "objective legal reasonableness" of the official's action. *Wilson*, 526 U.S. at 614 (internal quotation marks omitted). The official must have "fair warning" that his conduct is unconstitutional. *Hope*, 536 U.S. at 739-40 (internal quotation marks omitted).

Before we analyze the plaintiffs' claims in light of these governing principles, we pause briefly to recall the precise nature of their allegations against Dr. Elyea. They claim that, while serving as medical director of IDOC, Dr. Elyea inaugurated a protocol for hepatitis C treatment that categorically required that *all* candidates for antiviral therapy—despite their particular genotype—have

at least two years left on their sentence. This categorical rule, the plaintiffs submit, deprived them of necessary treatment that would have been effective. This rule was grounded, they further contend, in consideration of administrative convenience rather than medical effectiveness.

Although the parties can point to no case that *held* squarely that such a policy was constitutional or unconstitutional, Dr. Elyea points to two cases that take note that two other states had the same or similar policies. *See McKenna*, 386 F.3d 432; *Bender*, 385 F.3d 1133. Notably, neither of these cases hold, or even suggest, that the policies mentioned were constitutionally acceptable. We believe that there was sufficient guidance that Dr. Elyea, or any other reasonable prison medical director, should have been on notice that such a policy was violative of the Eighth Amendment.

At the outset, we note that the cases that Dr. Elyea claims supported his contemporaneous belief in the legality of his conduct *do not hold* that waiting periods for treatment of HCV infection are constitutional. *Bender* simply held that a treating general practitioner was not deliberately indifferent to the needs of an inmate for antiviral therapy when the physician had referred the inmate to, and was awaiting further recommendations from, a specialist. 385 F.3d at 1138. *McKenna* rejected an appeal from the denial of the qualified immunity defense on a motion to dismiss by medical and other prison officials responsible for the denial of antiviral therapy to an inmate with HCV. 386 F.3d at 437. Indeed, Dr. Elyea

has not presented us with *any* case from any court in which a similar, *categorical* treatment policy has been upheld against a constitutional challenge.

In contrast, at the time Dr. Elyea acted, several cases had acknowledged that deliberate indifference claims based on medical treatment require reference to the *particularized circumstances* of individual inmates. *See, e.g.*, *Rouse v. Plantier*, 182 F.3d 192, 199 (3d Cir. 1999) (remanding a class action to the district court for sub-classifications among a "medically diverse group" of individuals with different stages of diabetes, because alleged violations of the Eighth Amendment "obviously var[y] depending on the medical needs of the particular prisoner"); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 & n.32 (3d Cir. 1987) (noting that, by virtue of a blanket policy of denying elective abortions and failing to consider factors relevant to each particular inmate "the County denies to a class of inmates the type of *individualized treatment* normally associated with the provision of adequate medical care" (emphasis added)). Indeed, it is implicit in the professional judgment standard itself, which long predates the actions relevant to this case, that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments. *See Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that

is, that no minimally competent professional would have so responded *under those circumstances*." (emphasis added)).

We emphasize, however, that the necessity of individualized treatment does *not* mean that the use of treatment protocols and guidelines is generally unconstitutional. Indeed, in the ordinary course, such standard practices implement a professional discipline that in turn facilitates appropriate and quality care within large and administratively complex institutional settings, including correctional systems. Often, as is the case in Illinois, outside contractors provide day-to-day care, and a carefully crafted protocol can ensure the maintenance of legally and medically acceptable standards of care throughout the system. In the prison context, however, such protocols must ensure that prison officials fulfill their responsibility to provide constitutionally adequate care to each individual inmate with reference to his particularized medical need. Here, the FBOP Guidelines employed by Dr. Elyea as a guide in formulating and implementing IDOC's policy were no doubt a useful tool and, as a general matter, might assist in assessing treatment options with respect to a disease that is slow-progressing and highly dangerous or fatal, over time, in only a small percentage of infected persons. *See* Trial Ex. 3 at 41-42 (directing treating physicians to weigh relevant factors, including that only 10-15% of infected persons will develop complications of long-term liver disease, in determining the appropriateness of treatment). With respect to an individual case, however, prison officials still must make a determination that application of the

protocols result in adequate medical care. *Cf. Johnson v. Wright*, 412 F.3d 398, 406 (2d Cir. 2005) (holding that an inmate with HCV had produced sufficient evidence to survive summary judgment on a deliberate indifference claim, in part, by demonstrating that officials were "reflexively relying on the medical soundness of" a policy "when they had been put on notice that the medically appropriate decision could be, instead, to depart from" that policy). This basic legal obligation to provide care adequate to a particular inmate's medical circumstances should have been clear to reasonable physicians with the responsibility for creating inmate healthcare policy in 2003.

There was evidence in the record that permitted the jury to conclude that Dr. Elyea in fact implemented not the federal policy, but a variation of it. Under that variation, all genotypes of the disease were handled in the same way. Although certain genotypes, such as the one that afflicted Mr. Roe, could be treated in a relatively short period of time, patients with these genotypes were treated in the same manner as those requiring a longer period, and therefore a longer expected term of incarceration. There was also record evidence that permitted the jury to conclude that, in formulating the Illinois policy, Dr. Elyea was motivated by administrative convenience rather than patient welfare. According to Dr. Elyea's deposition testimony, confirmed by his testimony at trial: "At the time we set this up, there *may not have been any real medical reason* other than to keep it simple for folks." R.110 at 123 (emphasis added). Dr. Elyea did testify that he believed the policy was "medically sound"

and based on the guidelines, *id.* at 135, even if the limitations were not instituted for medical reasons. *See also id.* at 113 (Dr. Elyea testifying that "I felt medically that the ones that weren't getting treatment did not need it at that point."). Since *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976) (internal quotation marks omitted), it has been established that the choice of an "easier and less efficacious treatment" can demonstrate that the actor displayed "deliberate indifference . . . rather than an exercise of professional judgment." *Id.* (citing *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974)). The evidence permitted, although it did not compel, the jury to conclude that Dr. Elyea's policy prevented treating physicians from exercising any professional judgment as to whether to commence interferon treatment for inmates who could complete the prescribed course of treatment during the remaining period of their incarceration. Mr. Roe's records reflect that on several occasions his physicians identified him as not a candidate for treatment *because of the policy*.[14]

Under these circumstances, we believe that the district court properly denied, each time it was presented, Dr. Elyea's invocation of qualified immunity.

---

[14] Although Dr. Elyea testified that if treating physicians wanted to deviate from the policy, they could contact him and request it, there is no evidence in the record that IDOC's treating physicians understood the policy to contain that flexibility. R.110 at 134.

**E.  The Plaintiffs' Claims**

With the questions of our jurisdiction and qualified immunity resolved, we now turn to the specific facts raised in each plaintiff's claim.

**1.  Mr. Roe**

Following the jury verdict in Mr. Roe's favor, the district court denied Dr. Elyea's motion for judgment as a matter of law. Dr. Elyea contends that this was error. He first asks this court to conclude that Mr. Roe failed to establish the substantive elements of a deliberate indifference claim, which we already have set forth. Further, he believes that even if Mr. Roe demonstrated an actionable violation of his constitutional rights, Mr. Roe failed to show an injury and causation that would permit the damages allowed by the district court.

**a.  Sufficiency of the Evidence to Support Mr. Roe's Deliberate Indifference Claim**

We begin with an evaluation of the elements of Mr. Roe's deliberate indifference claim. We believe that there is sufficient evidence in the record to support the jury's conclusion that Mr. Roe established both an objective serious medical need and that the policy Dr. Elyea implemented evinces a deliberate indifference to that need.

First, sufficient evidence supported the jury's conclusion that Mr. Roe had an objectively serious medical need for treatment in 2004. As we acknowledged in *Edwards v.*

*Snyder*, 478 F.3d 827 (7th Cir. 2007), our cases demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 831 (collecting cases);[15] *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (holding that tooth decay can constitute an objectively serious medical condition). Based on the evidence submitted by Mr. Roe in support of his claim, the jury was entitled to conclude that his HCV infection and resultant physical condition were sufficiently serious to meet that standard. Specifically, as the FBOP Guidelines make clear, at least for some patients, HCV infection is a serious medical condition that can lead to irreversible physical damage and even life-threatening situations. Mr. Roe's own medical records show not only that he had been diagnosed with HCV

---

[15] *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007), which involved a dislocated finger, relies on a number of other Seventh Circuit cases to reach its conclusion that the plaintiff had not pleaded himself out of court by alleging a condition that could not meet the objective prong of the deliberate indifference standard. *See O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (per curiam) (minor burns resulting from lying in vomit); *Norfleet v. Webster*, 439 F.3d 392, 394-95 (7th Cir. 2006) (arthritis); *Johnson v. Doughty*, 433 F.3d 1001, 1003-04, 1010 (7th Cir. 2006) (hernia); *Greeno v. Daley*, 414 F.3d 645, 649-51 (7th Cir. 2005) (heartburn and vomiting); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (fractured wrist).

infection, but that his enzyme levels were repeatedly twice normal over a period of several years. Given his particular history, the FBOP Guidelines counseled, at minimum, biopsy of the liver and consideration for antiviral therapy.[16] The recommendations set forth by the federal prison system, read together with Mr. Roe's medical history and testimony regarding his symptoms, are sufficient evidence to permit the jury to conclude

---

[16] We disagree with Dr. Elyea's assertion that the Guidelines permit deferral of treatment for at least two years, because a section entitled "Detention center/short-term inmates," states that "[i]nmate candidates for hepatitis C treatment entering BOP short-term detention facilities should ordinarily not be started on antiviral therapy." Trial Ex. 3 at 41. In Dr. Elyea's view, because a detainee might remain in that system for two years without entitlement to treatment, the Guidelines require nothing more for inmates actually sentenced to terms shorter than two years.

The quoted section continues, however, to explain that a "[t]reatment decision[] should be deferred until the inmate is *sentenced and redesignated or released*," *id.* (emphasis added). This context makes plain that the Guidelines are drawing a distinction between inmates whose future term is wholly uncertain and those who will serve finite terms of incarceration. The point is made even clearer by the following section of the Guidelines, which provides direction in the case of "Long-term (sentenced) inmates." *Id.* We, like the district court, are not persuaded that Dr. Elyea can assert compliance with the Guidelines as conclusive evidence that his conduct met or exceeded the constitutional minimum standard of care under these circumstances.

that Mr. Roe's HCV infection amounted to a serious medical need.

Second, Mr. Roe presented sufficient evidence from which a jury could conclude that Dr. Elyea acted with a sufficiently culpable state of mind in setting the IDOC policy that resulted in a denial of the treatment recommended under the Guidelines to Mr. Roe. Under that policy, inmates were denied further testing and treatment for HCV infection *categorically* based on the expected length of their continued incarceration in an IDOC facility. In addition to mandating that inmates have one year of incarceration left for a treatment regimen to begin, the policy required an additional year to allow for enzyme level checks six months apart and an additional six months to "allow the vendor ample time for" some unspecified "workup" prior to the biopsy. R.110 at 127 (testimony of Dr. Elyea). IDOC justified this policy because the Guidelines note that an interrupted course of treatment may pose further health risks and because, with respect to *some* (but not all) genotypes, forty-eight weeks was the recommended course of treatment. According to Dr. Elyea, IDOC adopted the policy because it wanted to keep its protocols "consistent for all of the people who had hepatitis C." *Id.* at 113.

The failure to consider an individual inmate's condition in making treatment decisions is, as we already have concluded, precisely the kind of conduct that constitutes a "substantial departure from accepted professional judgment, practice, or standards, [such] as to demonstrate that the person responsible actually did not

base the decision on such a judgment." *Sain*, 512 F.3d at 895 (internal quotation marks omitted). Indeed, at trial, Dr. Elyea confirmed his deposition testimony that, "[a]t the time we set this up, there may not have been any real medical reason" for the policy of presuming a forty-eight-week treatment period for all inmates, regardless of genotype, "other than to keep it simple for folks." R.110 at 123. Although administrative convenience and cost may be, in appropriate circumstances, *permissible factors* for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered *to the exclusion of reasonable medical judgment* about inmate health. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citations omitted)). Given Dr. Elyea's own testimony, this is simply not a case where the jury was required to conclude that Mr. Roe's care plan was a result of a "deliberate decision by a doctor to treat a medical need in a particular manner." *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (quotation marks omitted). Rather, it was entitled to conclude that Dr. Elyea's action constituted a failure to exercise medical—as opposed to administrative—judgment at all.[17]

---

[17] In his testimony, Dr. Elyea did state that treatment for all inmates with hepatitis would be impossible, estimating the

(continued...)

Under these circumstances, the district court did not err in denying judgment as a matter of law to Dr. Elyea on the ground that Mr. Roe failed to present sufficient evidence from which a jury could conclude that he had satisfied both the objective and subjective elements of a deliberate indifference claim.

### b. Injury, Causation and Damages

Dr. Elyea also submits that Mr. Roe failed to provide sufficient evidence from which a reasonable jury could conclude that the IDOC two-year policy, and its application to him during his 2004 incarceration, caused him any injury. First, Dr. Elyea claims that Mr. Roe failed to account for other factors that could have been the cause of any injury, including a failure to receive treatment while not in custody and abuse of alcohol. Second, he claims that the incarceration period in question for Mr. Roe lasted only nine months, and that, for a period during those nine months, Mr. Roe was being treated

---

[17] (...continued)

costs at some $300-400 million without further explanation. *See* R.110 at 135. If IDOC's financial constraints limit the care available, Dr. Elyea might well be justified in triaging the cases and deciding eligibility for treatment. However, in order for that triage not to run afoul of the Eighth Amendment, the decision about who should have priority for care must itself be based on medical judgment. The jury was entitled to conclude, on the record before it, that the categorical delay period was not a medical judgment.

(apparently mistakenly) for latent tuberculosis; such treatment was incompatible, he notes, with treatment for hepatitis C, and thus the treatment period could not be completed during the incarceration. Third, Dr. Elyea claims that the success of treatment is highly variable, and thus, it would be "rank speculation" to find the policy harmed Mr. Roe. Appellee/Cross-Appellant's Br. 36.

As the Supreme Court repeatedly has noted, § 1983 "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994) (internal quotation marks omitted). A successful § 1983 plaintiff therefore must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).

We begin with the concept of injury. At trial in 2008, the district court noted that Mr. Roe appeared in significantly diminished health. Further, it is apparently undisputed that Mr. Roe's liver disease had progressed so significantly shortly thereafter that it caused his death. Dr. Elyea contends that other causes might well have accounted for Mr. Roe's condition, and, therefore, no injury has been demonstrated. Dr. Elyea notes that Mr. Roe did not obtain treatment for himself when he was not incarcerated and, further, that there is some evidence in the record that Mr. Roe had engaged in other behaviors that put his liver health at risk after leaving

IDOC custody in 2004.[18] These observations, although correct, miss the mark. The administrator of Mr. Roe's Estate need not prove that this severe progression of disease in 2008 to the point of death is directly traceable to Dr. Elyea's conduct. All that is required to support the verdict is *some* actual compensable injury, causally connected to the application to Mr. Roe of IDOC policy set by Dr. Elyea.[19]

The record is sufficient to support the jury's conclusion on this issue. At trial, Mr. Roe testified that his symptoms included stomach distention, nose bleeds, rashes and bowel irregularity that had worsened significantly in the months leading to trial. R.110 at 44. His prison records, which provide contemporaneous accounts of his physical complaints, verify that some of these symptoms stretched back to the period in question and beyond. *See, e.g.*, Doc. 1-286, Offender Outpatient Progress Notes (Apr. 7, 2004) (noting complaints of left abdominal pain "ascribe[d] . . . to hepatitis C" and the corresponding physician plan to order ALT and AST

---

[18] Specifically, Mr. Roe was reincarcerated for a felony charge of driving under the influence in 2007, which necessarily means that he had consumed alcohol to the point of intoxication, at least on the occasion of that offense.

[19] *See Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999) (noting that, under tort principles applicable in § 1983 actions, a plaintiff must show that "he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant").

testing in response); Doc. 1-288, Offender Outpatient Progress Notes (May 6, 2004) (noting "pain in left side of abdomen" which "radiates to left leg," directly under which the physician has written "Hepatitis C. Not a candidate for biopsy of liver," and noting ALT and AST levels of 180); Doc. 1-248, Medical Progress Notes (July 15, 2002) (noting "bowel issues"). Furthermore, in his deposition testimony, Mr. Roe stated that, not long after his release from prison in 2004, he was sent for a consultation with a liver specialist.[20] According to Mr. Roe, that specialist confirmed by simple palpation of his abdomen that Mr. Roe had "early stages of cirrhosis and fibrosis setting" in, and that treatment should proceed even without a biopsy being performed.[21] Trial Ex. 6, Roe Dep. 23. At that time, Mr. Roe could not afford the treatment because he was awaiting approvals on his applications for public assistance. We previously have held that testimony from which a jury could infer that a prison employee's overnight delay in providing treatment for an inmate's infection caused "many more *hours* of needless suffering" was sufficient to withstand summary judgment. *See Gil v. Reed*, 381 F.3d

---

[20] The depositions of the plaintiffs were admitted into evidence without objection as Defendants' Ex. 6.

[21] This recommended course of treatment is consistent with the Guidelines, which note that "[i]nmates with suspected compensated cirrhosis based on clinical and laboratory parameters should be *either* referred directly for liver biopsy *or treated empirically (without biopsy confirmation)* in consultation with a specialist." Trial Ex. 3 at 43 (emphasis added).

649, 662 (7th Cir. 2004) (emphasis added). We have little difficulty in concluding that the symptoms Mr. Roe endured during the period of his relevant incarceration and shortly thereafter were, in and of themselves, and regardless of the more severe symptoms that would befall him in the years following, at least minimally sufficient to support the jury's verdict and compensatory damages award. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) (noting the standard of review).

The plaintiffs, and Mr. Roe specifically, proceeded precariously in this regard by failing to introduce their own medical expert, who might have testified directly to the medical issues involved in the causation analysis.[22]

---

[22] *See Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010) (noting that, in the absence of evidence of the "exact cause" of the plaintiff's death, "the jury should hear testimony, backed by accepted medical science, about factors that could have exacerbated her heart condition"); *Walker v. Peters*, 233 F.3d 494, 502 (7th Cir. 2000) (rejecting an Eighth Amendment claim because the prisoner's expert had opined that the refusal of prison physicians to provide medication on certain occasions might have been the cause of the injury, while another explanation not attributable to the physician's conduct might also have been the cause). *But see Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007) (concluding that medical records alone, even when contradicted by adverse expert testimony, were sufficient to support a finding that a delay in treatment caused the plaintiff harm and satisfied the "verifying medical evidence" requirement in delayed treatment cases).

Instead, the plaintiffs relied on the *adverse* testimony of Dr. Elyea himself and on the Guidelines. Although this way of proceeding was a risky trial strategy when the condition at issue—hepatitis C—was outside the common experience of lay jurors,[23] we must conclude that, in this case, the evidence recounted above was minimally sufficient to allow a reasonable juror to conclude that an injury attributable to the policy had been established by Mr. Roe.

Dr. Elyea did produce contrary evidence on the issue of whether any of the plaintiffs, including Mr. Roe, suffered any injury as a result of IDOC treatment policy. Dr. Elyea himself testified, consistent with the Guidelines, that the normal course of HCV infection would take twenty or more years to result in significant liver disease, if it does so at all, and remains "asymptomatic" unless "the disease is at its end stages." R.110 at 94, 95. At trial, counsel for Dr. Elyea contended that the lack of any "short-term impact" of the disease justified, in all cases covered by the policy, denial of further testing and consideration for treatment. *Id.* at 190-91. The force of these general statements about the normal progression of the disease, however, did not *require* the jury to find that, in the case of Mr. Roe, he was not injured by the failure of IDOC to provide treatment. In fact, these general state-

---

[23] *Cf. Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009) (noting that, in the case of pain allegedly caused by beating, "[n]o expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations").

ments are particularly unpersuasive when the prison's own medical records indicate that Mr. Roe believed he had been infected since the 1970s; it is unsurprising, therefore, that he had advanced liver disease in 2003. The "short-term" for Mr. Roe, it seems, was actually the long-term consequence of a decades-old infection.[24]

The State contends that, despite the evidence we already have discussed, facts specific to Mr. Roe's case demonstrate that any injury he suffered was not the result of the blanket length-of-incarceration-based IDOC policy rather than sound medical judgment. The State notes that the Guidelines recommend twenty-four weeks of antiviral treatment for Mr. Roe, but that, because of his original misdiagnosis for tuberculosis, he could not have completed treatment during his incarceration. Mr. Roe, however, had thirty weeks remaining in his incarceration when a repeat tuberculosis test revealed the misdiagnosis. Moreover, although the State is correct

---

[24] We note that there is some evidence in the record that factors other than hepatitis C contributed, at least in part, to some of Mr. Roe's physical complaints during his relevant period of incarceration. *See* Trial Ex. 6, Roe Dep. 43 (responding affirmatively to his attorney's question regarding abdominal pain during his incarceration as "what turned out to be the kidney stone"). However, when viewed in light of the other record evidence, specifically the specialist's statements to Mr. Roe that liver disease was discernible on physical examination without need for biopsy in the period immediately following the incarceration in question, the jury's verdict is not so lacking in evidentiary support that it must be overturned.

to note that current treatment for tuberculosis is a contra-indication for interferon treatment for hepatitis C, there is nothing in the record to suggest that tuberculosis treatment prevents the pre-treatment work-up, including the biopsy. *See* Trial Ex. 3 at 49. If tuberculosis, or indeed any other contraindication to the *work-up* was present in Mr. Roe's case, the State should have provided evidence of it at trial. Moreover, because of his prior incarceration periods in IDOC facilities in the not-distant past, Mr. Roe already had had numerous tests related to hepatitis C and other health screens. In light of the existing medical record, it is not clear what remained to be done in the typical six-month pre-biopsy work-up in his case, nor did the State analyze the medical records on this point at trial. *See* Trial Ex. 6, Roe Dep. 23 (noting that a specialist had recommended treatment in 2004 without biopsy because liver disease was evident on physical examination).

Finally, the State submits that Mr. Roe cannot establish causation because the success of treatment for hepatitis C is highly variable. Although the record supports the conclusion that the long-term efficacy of interferon treat-ment is not known, the record also supports the view that the treatment denied Mr. Roe is the standard in the medi-cal community *and* the standard in the *prison* medical community. *See* R.110 at 130-31 (testimony from Dr. Elyea noting that "[t]he experts feel" that reducing viral load through interferon therapy is the appropriate treatment, although, because the treatment is relatively new, long-term efficacy is not known); *see also* Trial Ex. 3 at 44 ("Antiviral therapy is recommended for patients with chronic hepatitis C and a liver biopsy with portal or

bridging fibrosis and at least moderate inflammation and necrosis."); *id.* at 43 ("Inmates with suspected compensated cirrhosis based on clinical and laboratory parameters should be *either* referred directly for liver biopsy *or treated empirically (without biopsy confirmation)* in consultation with a specialist." (emphasis added)). In our view, this evidence of the general standard of care is a sufficient basis from which a jury reasonably could infer that some of Mr. Roe's injury and discomfort during the relevant period is attributable to the failure of IDOC to treat him consistent with that standard. More importantly, we see no reason to conclude that the uncertainty of the long-term efficacy of treatment prevents a jury from concluding that the denial of that treatment, in a specified period, resulted in an injury to Mr. Roe.

Accordingly, we conclude that the record contains sufficient evidence of causation to support the jury's verdict in favor of Mr. Roe.[25]

### 2. Mr. Walker

The district court entered judgment as a matter of law against Mr. Walker because it concluded that, al-

---

[25] Given our conclusion that the record evidence is sufficient to support an award for the period during and immediately following his 2004 incarceration, we need not address Mr. Roe's failure to obtain treatment on his own or any additional risk behaviors he may have engaged in that hastened the progression of the disease after 2004 and caused further identifiable injury.

though Mr. Walker's treatment had been delayed until 2007, Dr. Elyea was not responsible for that delay. The plaintiffs' general theory of liability was that Dr. Elyea set IDOC policy and that the policy denied them adequate care. The evidence at trial demonstrated that, under the policy, Mr. Walker *should have* received treatment earlier: Because of the length of his sentence, the requirement of two additional years of incarceration was no bar to treating him. Dr. Elyea, therefore, is not liable in his policy-making role.

Mr. Walker posits an alternate theory of liability on his claim against Dr. Elyea. Specifically, Mr. Walker points to the response he received to a particular grievance that he filed, which he believes demonstrates that Dr. Elyea was involved personally in the decision to delay his care. In it, the Health Care Unit Administrator, Dave Huffman, states that treatment will not be provided and that "[t]he Medical Director is monitoring the disease process appropriately." Doc. 1-160. Dr. Elyea testified that each facility has an on-site medical director who was involved in inmate-specific care decisions. Dr. Elyea contends that Huffman must have been referring to this director. In support of his argument, he notes that other memos from Huffman refer to Dr. Elyea as the "Agency Medical Director." *See, e.g.*, Trial Ex. 5, Huffman Memo Re: Stephens (Apr. 19, 2004). In the view of Dr. Elyea and of the district court, the "only reasonable inference that arises is that [Huffman] meant the medical director on site, not the agency medical director." R.88 at 14.

A jury reasonably could not conclude, on the basis of the reference to "Medical Director" in the Huffman memo alone, that Dr. Elyea was responsible for the delay of care to Mr. Walker. As the district court noted, the use of the term was ambiguous, and, standing alone, could have given rise to an inference that Huffman was referring to Dr. Elyea; the other evidence in the record, however, which demonstrates both that the on-site medical directors, not Dr. Elyea, were involved in care decisions and that Huffman himself employed different terminology when referring to Dr. Elyea, makes clear that the jury could not have drawn that inference reasonably. Huffman's use of the ambiguous term is simply not sufficient, in light of the other evidence in the record, to support a finding of Dr. Elyea's personal liability. Accordingly, we affirm the judgment of the district court as to Mr. Walker.

### 3. Mr. Stasiak

The district court entered judgment as a matter of law against Mr. Stasiak because it concluded that the Guidelines did not provide a clear directive for treatment in his case. His ALT level was more than twice normal at his initial test, and, over two tests in the following five months, his levels remained elevated. The last of these tests was reported in handwritten notes by the medical staff on May 11, 2004. Mr. Stasiak's "out date" was December 8, 2004.

We respectfully disagree with the district court that the Guidelines were unclear about Mr. Stasiak's course

of care. At the time of his May 11, 2004 lab values, taking the evidence in the light most favorable to the jury's verdict,[26] he had shown ALT levels of more than twice normal on at least three tests conducted over a five-month period. Under these circumstances, the Guidelines recommend biopsy.[27] Trial Ex. 3 at 43. However, at this point in his incarceration, Mr. Stasiak had fewer than six months remaining on his sentence, which was insufficient time to conduct a biopsy and give him even the shortest recommended course of treatment for any genotype of hepatitis under the then-applicable version of the Guidelines. Accordingly, we affirm the district court's entry of judgment as a matter of law for Dr. Elyea on Mr. Stasiak's claim.

---

[26] The jury reasonably could have concluded that the May 11, 2004 notation by the medical staff that indicated ALT levels as "↑," indicated that they had risen again from their previous level, already more than twice normal.

[27] We acknowledge that, subsequent to the early 2004 tests which showed significant elevations in liver enzyme levels, Mr. Stasiak's late 2004 tests showed diminishing enzyme levels that, standing alone, would not have required a biopsy under the Guidelines. *See infra* n.11. Even at the time when the medical evidence was *most favorable* to Mr. Stasiak's request for a biopsy and treatment, he would not have had sufficient time remaining in the facility for even the shortest course of treatment recommended by the Guidelines in effect at the time.

### 4. Mr. Stephen

The district court determined that Mr. Stephen had not established that he had been harmed by Dr. Elyea's two-year policy. Specifically, the district court found that, although the elevations in Mr. Stephen's enzyme levels were at times more than seven times the normal rates, Mr. Stephen's length of incarceration never permitted him to undergo a complete course of treatment. That is, although by the time of his 2005 incarceration, Mr. Stephen had a history of significantly elevated enzyme levels that would have called for biopsy under the Guidelines, he was incarcerated thereafter only for a period of seven months and a later period of two months. Mr. Stephen submitted no evidence into the record of his genotype of hepatitis to prove that he was a candidate for the short, twenty-four-week treatment period. As a result, the district court concluded that Mr. Stephen failed to prove that Dr. Elyea's policy caused him any harm.

On appeal, Mr. Stephen does not point to any evidence in the record that satisfies the failing identified by the district court. Instead, we understand Mr. Stephen to argue that he should not have been responsible for genotype testing because of the Guidelines' recommendation that such testing be obtained in his circumstances. Although this may be a correct statement of the Guidelines' recommendation, and, indeed, might be relevant to the issue of whether Mr. Stephen's *right* was violated, his failure to submit evidence on the issue of his genotype dooms his case. Because he failed to demonstrate

that, by virtue of his genotype, he was a candidate for the shorter course of treatment, he has not demonstrated injury or causation *as a result of the policy*. Nor can the failure of IDOC to obtain genotype testing itself qualify as an injury, unless that failure to obtain the test disqualified him from further treatment to which he would have been entitled—a question we cannot answer without knowing his genotype. Accordingly, we affirm the court's entry of judgment as a matter of law to Dr. Elyea on Mr. Stephen's claims.

## Conclusion

For the reasons set forth above, we affirm the judgment of the district court. The district court properly upheld the jury's verdict as to Mr. Roe, subject to its remittitur, which was accepted by the Estate. Further, the district court properly entered judgment as a matter of law in favor of Dr. Elyea and against Mr. Walker, Mr. Stasiak and Mr. Stephen.

AFFIRMED