RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TAMMY M. BRAWNER,

                  *Plaintiff-Appellant,*

      *v.*

SCOTT COUNTY, TENNESSEE,

                  *Defendant-Appellee.*

No. 19-5623

On Petition for Rehearing En Banc.
United States District Court for the Eastern District of Tennessee at Knoxville;
No. 3:17-cv-00108—J. Ronnie Greer, District Judge.

Decided and Filed:  December 1, 2021

Before:  CLAY, WHITE, and READLER, Circuit Judges.

_____

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Caitlin C. Burchette, Arthur F. Knight, III, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellee. **ON RESPONSE:** Richard E. Collins, II, STANLEY, KURTZ & COLLINS, PLLC, Knoxville, Tennessee, Megha Ram, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., David M. Shapiro, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Chicago, Illinois, for Appellant. **ON AMICUS BRIEF:** Jeffrey C. Mando, Claire E. Parsons, ADAMS LAW, PLLC, Covington, Kentucky, D. Barry Stilz, KINKEAD & STILZ, Lexington, Kentucky, for Amicus Curiae.

The panel issued an order denying the petition for rehearing en banc.  READLER, J. (pp. 3–10), delivered a separate opinion dissenting from the denial of the petition for rehearing en banc in which THAPAR, BUSH, NALBANDIAN, and MURPHY, JJ., joined.

―――――――――――

## ORDER

―――――――――――

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision. The petition then was circulated to the full court. Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied. Judge Readler would grant rehearing for the reasons stated in his original dissent and the one appended hereto.

_____

**DISSENT**

_____


CHAD A. READLER, Circuit Judge, dissenting from the denial of rehearing en banc. We should not be enlisting a case about excessive force to disturb our deliberate indifference to medical needs jurisprudence. *Brawner v. Scott County*, 14 F.4th 585, 605 (6th Cir. 2021) (Readler, J., concurring in part and dissenting in part) ("*Kingsley* [*v. Hendrickson*] would be the quintessential stalking horse if invoked as grounds to overrule our current deliberate indifference precedent."). For that and other reasons, I continue to see *Brawner* as a flawed decision. *See generally id.* at 605–11.

Yet even more worrisome is the overarching trend *Brawner* perpetuates. For in both our Eighth Amendment and Fourteenth Amendment jurisprudence, we have moved far away from the Amendments' original public meaning in resolving detainee civil rights litigation. Making matters worse, we have crafted a legal standard for deliberate indifference cases that ignores the Supreme Court's instruction to view those cases through both an objective *and* subjective lens. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). And these cases are legion, given the frequency with which we are asked to entertain them. *See, e.g.*, Federal Judicial Center, *IDB Appeals 2008-present*, https://www.fjc.gov/research/idb/interactive/21/IDB-appeals-since-2008 (last visited Dec. 1, 2021) (reporting that, since 2008, 16.5 percent of the Sixth Circuit's civil docket has been comprised of "prisoner civil rights" and "prison conditions" claims). So far, our en banc Court has been reluctant to reign in wayward decisions like *Brawner*. Before long, our Court, if not a higher one, should correct this misguided course.

1. Let me begin with *Brawner*. The majority opinion is yet another example of our Circuit transforming constitutional prohibitions against punishment into a "freestanding right to be free from jailhouse medical malpractice." *Brawner*, 14 F.4th at 610 (Readler, J., concurring in part and dissenting in part). The *Brawner* majority opinion did so by forgoing any examination of the Fourteenth Amendment's text or original public meaning. Instead, it turned to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), an excessive force decision that, all agree, did not address "other Fourteenth Amendment pretrial-detainment contexts." *Brawner*, 14 F.4th at

592.  Despite *Kingsley*'s express limits, *Brawner* used *Kingsley* to jettison our traditional inquiry in the deliberate indifference setting.  Rather than asking whether the defendant was subjectively aware of the serious medical risks facing the detainee, *Brawner* adopted a reckless disregard standard, a benchmark we are told should be viewed through the eyes of a "reasonable official in the defendant's position."  *Brawner*, 14 F.4th at 597 (citation omitted).  In that world, if a plaintiff can muster more than a scintilla of evidence to suggest that an official acted with objectively unreasonable reckless indifference to a detainee's medical condition, it is left to the jury—effectively acting as both doctor and warden—to decide whether the official's actions were reasonable.

From a policy perspective, one might favor this approach.  But our terrain here is the Constitution.  And there, a "reasonable official" standard finds little grounding.  The Fourteenth Amendment familiarly prohibits an individual from being deprived of liberty without due process of law.  U.S. CONST. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  In the pretrial detainee context, that prohibition extends to state-sanctioned punishment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").  But beyond those contours, there is no textual or historical support for extending the prohibition more broadly to examine whether a jailer's actions are "reasonable."  *See Rhodes v. Michigan*, 10 F.4th 665, 694–95 (Thapar, J., dissenting in part).  And any purported validation of that view in Supreme Court precedent (*e.g.*, *Kingsley*) should be cabined to its particular context, *see Garza v. Idaho*, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting) (observing that when a precedent is incorrect as an "original matter," a court should "tread carefully before extending" that precedent).

2.  Truth be told, efforts in this Circuit to tortify the Constitution did not begin with *Brawner*.  The notion of eliminating any inquiry into a government official's subjective motivations regarding the provision of medical treatment, as *Brawner* aims to do, finds allies in our jurisprudence.  To put that turn of events into context, consider first the origins of the constitutional deliberate indifference standard.  The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," *see* U.S. CONST. amend. VIII.  That prohibition was later

read to require the government to provide some level of medical care to prisoners. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Prisoner lawsuits claiming an Eighth Amendment violation stemming from an official's failure to prevent harm to a prisoner, however, raised the specter of "unbounded liability for prison officials." *Farmer*, 511 U.S. at 860 (Thomas, J., concurring in the judgment). To balance out these considerations, the Supreme Court in *Farmer* required a plaintiff asserting such a claim to show official wrongdoing measured both from objective and subjective viewpoints, the latter grounded in the concept of "deliberate indifference." 511 U.S. at 828, 834. *Farmer* defined deliberate indifference to mean that a prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference." *Id.* at 837. *Farmer* was thus thought to have "adopt[ed] a restrictive definition of deliberate indifference." *Id.* at 861 (Thomas, J., concurring in the judgment). *Farmer* did note that whether a prison official actually knew of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and . . . from the very fact that the risk was obvious." *Id.* at 842 (citation omitted). To help clarify that aspect of the opinion, *Farmer* provided an example of such an obvious risk: one that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." *Id.* at 842–43.

That formulation, however, is a far cry from how we have since gone on to interpret the "obvious" risk concept. Suffice it to say, in our Circuit, *Farmer*'s "hint" about "obvious" risks "bec[ame] a suggestion, [was] loosely turned into dictum and [was] finally elevated to . . . decision[s]" that transformed deliberate indifference. *United States v. Rabinowitz*, 339 U.S. 56, 75 (1950) (Frankfurter, J., dissenting). From the looks of things, deliberate indifference to one's medical needs—whether in the pretrial or prisoner context—is now functionally an objective-only standard in our Circuit. In that formulation, we ask only whether a risk was so obvious that the prison official should have known it presented a substantial risk of serious harm to the detainee—regardless of what the official actually knew. For instance, we have held that a jury could conclude that, in a case of involuntary commitment to a state psychiatric hospital, doctors acted with deliberate indifference because "a jury could possibly decide that a reasonable doctor,

in [the doctors' positions], would have concluded that a substantial risk of serious harm to the [patient] existed." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 845–46 (6th Cir. 2002); *see also Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550–51 (6th Cir. 2009) (holding that a genuine issue of material fact as to deliberate indifference existed when the prison official "was aware, or should have been aware" of the dangers posed to the prisoner); *Phillips v. Roane County*, 534 F.3d 531, 544 (6th Cir. 2008) (when analyzing the "subjective" component, "we ask whether a reasonable doctor in his position could have concluded that a substantial risk of serious harm to [the detainee] existed"). Similarly, we have found that a detainee satisfied her burden to show deliberate indifference under the "subjective" component where "there is evidence in the record to suggest that [the official] knew or had reason to know that [the detainee] had serious psychiatric needs that required treatment." *Richmond v. Huq*, 885 F.3d 928, 940–41 (6th Cir. 2018).

Lowering the deliberate indifference bar even further, we have made robust use of the summary judgment standard. Embracing the notion that reasonable inferences must be made in favor of the nonmoving party, we have held that a plaintiff can make a sufficient showing of deliberate indifference without presenting any evidence that the jail official actually knew of and inferred the substantial risk of serious harm to the detainee. To that end, we have explained that a plaintiff need only show a jail official was "allegedly aware of facts from which the inference of substantial risk of harm *could be* drawn." *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005) (emphasis added). And we have even gone on to hold that "deliberate indifference can be based on a strong showing on the objective component" (that the harm was sufficiently serious) such that a plaintiff need not offer evidence that the official actually drew the requisite inference. *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005).

This manipulation of *Farmer*'s aside about "obvious" risks is felt acutely in situations where the detainee self-reported symptoms. We have held that a plaintiff satisfies the burden to show that a prison official inferred the risk to the detainee, and fulfills the "subjective" component for summary judgment purposes, merely because the detainee self-reported an ailment. *See id.* (detainee told prison officer that she "was experiencing chest pains, had not

taken her 'heart' medication, and needed to go to the hospital"); *Garretson*, 407 F.3d at 798 (detainee told prison officer "that she required insulin for her condition and that she was past due for her current dose"); *see also Jones v. Muskegon County*, 625 F.3d 935, 943–44 (6th Cir. 2010) (finding a factual issue regarding delay after the detainee reported his abdominal pain and belief that he had cancer); *Phillips*, 534 F.3d at 540–41 (affirming denial of qualified immunity, partially because the "subjective" component was fulfilled by the detainee telling prison officers that she had chest pain and was experiencing shortness of breath, and prison protocol required officials to transport a detainee who complained of such symptoms to an emergency room); *Johnson v. Karnes*, 398 F.3d 868, 875–76 (6th Cir. 2005) (finding a genuine issue of material fact as to actual knowledge where the detainee submitted medical request forms "stating that his tendons were severed"); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) (finding a factual issue regarding delay after the detainee complained of stomach pain and vomited once after being given antacids). Never mind that a detainee's report of his symptoms does nothing to prove that a facility's medical officer actually "concluded that [the detainee] was at serious risk." *Phillips*, 534 F.3d at 546 (Ryan, J., concurring in part and dissenting in part).

In other cases, we have adopted this objective-only standard with less fanfare. For example, we have often relied on an expert's opinion that a reasonable doctor would have known of the risk to the detainee to hold that the plaintiff satisfied her burden, under the "subjective" component, to show the prison official knew of the risk. *See Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 682 (6th Cir. 2013) (prison doctor knew the detainee was taking two drugs and experts "state[d] that it is well known in the psychiatric profession" that the two drugs should not be administered together and, "if they are, the patient should be closely monitored for toxicity and adverse effects"); *Phillips*, 534 F.3d at 544 (expert stated that the prison doctor "failed to establish and maintain a medical record for this [detained] patient that would meet any minimum criterion for an acceptable medical record[]"); *Johnson*, 398 F.3d at 874, 876 (non-prison doctor who treated the detainee said "that it is common medical knowledge, which should be known to every medical practitioner, that severed tendons must be repaired in a timely manner"); *LeMarbe v. Wisneski*, 266 F.3d 429, 437–39 (6th Cir. 2001) (the prison doctor knew there was bile in the prisoner's stomach and an expert opined that the risk of harm to the plaintiff from bile in his stomach was "obvious to anyone with a medical education and to most lay people"). Needless to

say, reliance on an expert witness's "opinion of what [the defendant] or anyone with a medical education should have known" is "an objective standard, not a subjective one." *LeMarbe*, 266 F.3d at 441 (Batchelder, J., dissenting).

In short, even before *Brawner*, we had already diluted the traditional deliberate indifference inquiry merely to ask whether an official should have known of and inferred (rather than *actually* knew and *actually* inferred) that the detainee faced a substantial risk of harm. This objective-only inquiry for constitutional deliberate indifference claims pays no heed to the subjective inquiry we traditionally required. *See Farmer*, 511 U.S. at 829 (defining "deliberate indifference" as "requiring a showing that the official was subjectively aware of the risk"). Nor does it honor what, as its name suggests, should be obvious in this setting: that the conduct must be both "deliberate," that is, "[d]one with or marked by full consciousness of the nature and effects," *Deliberate*, American Heritage Dictionary (5th ed. 2020), and "indifferent," in other words, uninterested or unconcerned, *Indifferent*, American Heritage Dictionary (5th ed. 2020) ("Having no particular interest or concern."). And query how our decaying standard is any different from a state law negligence claim. On that front, it bears reminding that a detainee, just like an individual not in official custody, may bring a state tort claim should she be the victim of negligent medical care. But why has our Court allowed the detainee to also pursue a constitutional claim to seek compensation for negligent care (unencumbered by the liability-reducing damages caps and limits on attorneys' fees that often accompany a state law claim)? And why are medical providers who work in detention facilities subject to the risk of both state and constitutional theories of liability for providing negligent care? *See Rhodes*, 10 F.4th at 695 (Thapar, J., dissenting in part) ("By holding that a reckless workplace injury becomes a constitutional violation when (and only when) it takes place within a prison, the majority accelerates our doctrine's departure from the Punishment Clause's original meaning.") Our precedent answers those questions only with silence.

All of this is to say that, over time, we have seized on *Farmer*'s aside functionally to rid any serious inquiry into the subjective intentions of the sued government official. Yet what took decades to achieve, *Brawner* aims to accomplish more rapidly. What began as a requirement that the government official "both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and . . . draw the inference," *Farmer*, 511 U.S. at 837, has devolved into a nebulous consideration of whether "a reasonable official in [the official's] position would have known that the serious medical need posed an excessive risk to [the detainee's] health or safety," *Brawner*, 14 F.4th at 597. As we long ago abandoned the text and history of the Eighth and Fourteenth Amendments in favor of a "tender-hearted desire to tortify" the Constitution, such a departure is perhaps unsurprising. *Kingsley*, 576 U.S. at 408 (Scalia, J., dissenting). But it is no less regrettable.

3. So far, we have been unwilling to reconsider these developments. In fact, more than two decades have passed since the en banc Court last considered a detainee's deliberate indifference claim. *See Williams v. Mehra*, 186 F.3d 685, 687 (6th Cir. 1999) (en banc). Given the ensuing dilution of the governing standard, it is exceptionally important that we reconsider our precedent in this area. *See* Fed. R. App. P. 34(a). Otherwise, the lesson for future panels is obvious: fortune favors the bold.

Of course, we are not alone in endorsing this wayward trajectory for deliberate indifference claims. Indeed, today's writing is only the latest lament about the misguided nature of modern constitutional jurisprudence on detainee medical care. *See, e.g.*, *Edmo v. Corizon, Inc.*, 949 F.3d 489, 502 (9th Cir. 2020) (O'Scannlain, J., dissenting from the denial of rehearing en banc) ("[T]he panel concludes that [the doctor's] deviations were simply not 'reasonable'— the test for negligent malpractice, not deliberate indifference." (citation omitted)); *id.* at 505 (Collins, J., dissenting from the denial of rehearing en banc) ("[B]y narrowly defining the range of 'medically acceptable' options that the court believes a prison doctor may properly consider . . . and by then inferring deliberate indifference . . . the district court and the panel have applied standards that look much more like negligence than deliberate indifference."); *id.* at 511 (Bumatay, J., dissenting from the denial of rehearing en banc) ("If courts follow the panel's reasoning, in every case of medically unacceptable treatment, courts could automatically infer deliberate indifference. . . . [T]he ultimate effect of the panel's analysis is to dilute the heightened, subjective culpability . . . into mere negligence."); *Foelker v. Outagamie County*, 394 F.3d 510, 515 (7th Cir. 2005) (Manion, J., dissenting) ("[P]laintiffs should not be able to survive summary judgment by merely establishing a serious medical need and then claiming that

a defendant's failure to do more to recognize or treat that need amounted to deliberate indifference."). All things considered, our new-fashioned jurisprudence on Eighth and Fourteenth Amendment detainee medical claims is at best a mess—and at worst a "font of tort law" wholly divorced from the Constitution's text and original meaning. *Paul v. Davis*, 424 U.S. 693, 701 (1976).

This is no small matter. Not in substance, for the reasons just discussed. Nor in scope. Detainee medical malpractice claims are at the heart of federal dockets. Nearly 71,000 "prisoner civil rights" and "prison condition" claims have been appealed since 2008—that is, approximately 16.7 percent of the Courts of Appeals' civil docket. Federal Judicial Center, *IDB Appeals 2008-present*, https://www.fjc.gov/research/idb/interactive/21/IDB-appeals-since-2008 (last visited Dec. 1, 2021). Estimates indicate that up to a quarter of such claims concern medical treatment. Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1570–71 nn.47 & 48 (2003). Other studies suggest that 91 percent of jails holding 1,000 or more inmates have been sued by an inmate concerning medical care. Pew Charitable Trusts, *Jails: Inadvertent Health Care Providers*, at 9 (Jan. 2018); *see also* Zhen Zeng, *Jail Inmates in 2017*, Bureau of Justice Statistics, at 1 (Apr. 2019) (reporting that almost two-thirds of jail inmates were "unconvicted"). And these cases have real world consequences for those charged with the difficult task of running our detention facilities. After all, one cannot easily overstate the "Herculean obstacles" prison administrators face in "effective[ly] discharg[ing] the[ir] duties." *Procunier v. Martinez*, 416 U.S. 396, 404 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Yet how, as a jurisprudential matter, have we rewarded those who take up the "unenviable task" of ensuring the safety and rehabilitation of detainees? *Farmer*, 511 U.S. at 845 (citation omitted); *Procunier*, 416 U.S. at 404. With the likelihood of a summons and jury trial.

The Supreme Court's refrain rings clear today: "[C]ourts are particularly ill equipped to deal with the[] problems" of prison administration. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Procunier*, 416 U.S. at 405). Regrettably, we have turned a deaf ear to these concerns. Perhaps others, hearing this growing chorus, will decide to take action.

ENTERED BY ORDER OF THE COURT

_____

Deborah S. Hunt, Clerk