RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0177p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

CHARLES GEORGE STEIN,

                *Plaintiff-Appellant*,

    *v.*

CHRISTOPHER GUNKEL; TABATHA STERLING,

                *Defendants-Appellees*.

> No. 21-6118

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:19-cv-00159—David L. Bunning, District Judge.

Argued: June 7, 2022

Decided and Filed: August 9, 2022

Before: McKEAGUE, NALBANDIAN, and READLER, Circuit Judges.

───────────────

#### COUNSEL

───────────────

**ARGUED:** Benjamin T. D. Pugh, PUGH AND ROACH ATTORNEYS AT LAW, PLLC, Covington, Kentucky, for Appellant. Jeffrey C. Mando, ADAMS LAW, PLLC, Covington, Kentucky, for Appellees. **ON BRIEF:** Benjamin T. D. Pugh, Christopher D. Roach, PUGH AND ROACH ATTORNEYS AT LAW, PLLC, Covington, Kentucky, for Appellant. Jeffrey C. Mando, Jennifer L. Langen, ADAMS LAW, PLLC, Covington, Kentucky, for Appellees.

───────────────

#### OPINION

───────────────

McKEAGUE, Circuit Judge. After arriving at Boone County Detention Center following his arrest, plaintiff Charles Stein was badly beaten by a fellow detainee, Jordan Webster. He brings this suit against Sergeant Gunkel and Deputy Sterling, two jail officers who were involved

in determining the appropriate booking classification for Jordan Webster. Stein alleges that Gunkel and Sterling were deliberately indifferent to the excessive risk Webster posed to other detainees and thereby caused his injuries. The district court granted defendants' motion for summary judgment. We AFFIRM.

I.

Plaintiff Charles Stein was booked into Boone County Detention Center on nonviolent drug charges on November 7, 2018 at around 2:30am. Stein was initially kept on suicide watch and housed separately. The same was true for fellow inmate Jordan Webster, who was brought in on outstanding warrants for felony and misdemeanor assault. After both were cleared from suicide watch, Webster was placed in a cell with Stein. At approximately 8:00pm that night, while Stein was sleeping, Webster attacked and beat him.

A.

Boone County Detention Center conducts two stages of classification for detainees: one at arrival, and one after 72 hours.

At initial booking, a deputy makes a preliminary classification to decide what type of cell should be used to house the detainee immediately after arrival. This booking classification is done quickly, to clear what is otherwise a bottleneck for the jail. The booking deputy considers information from the arresting officer, information provided by the detainee on written intake forms and in response to questioning, and feedback from medical staff. At this stage, the booking deputy typically does not consult databases like the National Crime Information Center (NCIC). However, the deputy reviews all readily available information. If a detainee is "unconscious, assaultive, suicidal, or combative," the deputy is to inform a supervisor immediately.

Based on the information available to the deputy, she then assigns the detainee to an initial housing assignment. The cells available at booking include:

- *Short Term Single Sex/Passive Holding Cells*: For misdemeanor offenses, non-intoxicated, non-assaultive, bondable, and cooperative. Maximum stay of three hours.

- *Single Sex Detox Cells*: For those with a known management problem, the intoxicated, the combative, the non-bondable, and those charged with a felony offense.

- *High Risk Cells*: For those with a known management problem, who are suicidal or homicidal, with medical risk needs, who are combative or assaultive, who are intoxicated, or who present an escape risk.

- *Single Occupancy High Risk Cell*: "For an inmate who is displaying destructive behavior towards jail security equipment or any object in cell areas." R. 21-1, PID 100.

- *Single Sex Temporary Housing*: "Short term housing as determined by shift supervisor." *Id.*

- *Assessment Cells*: For the non-intoxicated, non-assaultive, and cooperative.

The booking deputy makes this initial classification. However, "[t]he shift supervisor has final discretion for any overrides of classification when there is a belief that there is a compelling safety or security issue which requires an override."

After 72 hours at the jail, a shift supervisor then makes a security classification. At this stage, the officer conducts a comprehensive review of information available about the detainee to determine which one of five security levels is appropriate for longer-term housing.

Booking and security classifications are both subject to change at any time, based on the availability of new information, or based on observed behavior.

B.

On November 7, 2018, police officers found Charles Stein asleep in his car at a gas station. Smelling marijuana, they asked him to step out of the vehicle, at which point they identified other drugs and paraphernalia in the car and placed him under arrest. At around 2:30am, officers took him to the jail.

Defendant Deputy Tabatha Sterling was the booking officer on duty that morning. Deputy Sterling and the jail nurse both identified that Stein was intoxicated and that he expressed suicidal ideations. Deputy Sterling therefore determined that Stein was "High Risk" and in need of medical observation. He was also placed into a suicide prevention vest or "turtle suit" and put in Cell 221, the "Single Sex Temporary Housing" cell, around 2:48am, with the stated purpose of

"Mental Health Observatioin [sic]." Staff would have checked on Stein every fifteen to twenty minutes as part of the suicide watch.

Deputy Sterling's shift ended at 7:00am, at which point Stein was still in Cell 221 alone. Defendant Sergeant Chris Gunkel began his shift at 7:00am. Sergeants like Gunkel were typically the officers in charge of the jail during their shifts. Around 1:00pm, Sergeant Gunkel moved Stein from Cell 221 to Cell 331, a "Single Sex Detox Cell," where Stein was held alone because he was still on suicide watch. Sergeant Gunkel's shift ended at 3:00pm.

At 4:29pm, Stein was cleared from suicide watch by the jail's medical team. Sergeant Berry was one of two supervisors on duty at that time. About 45 minutes later, Sergeant Berry changed Stein's booking classification from "High Risk" to "Detox," and placed other inmates into Cell 331 with Stein.

## C.

Jordan Webster was arrested by Deputy Sheriff Miller in the early morning hours of November 7, 2018. He was transported to St. Elizabeth Hospital for a mental health evaluation. Webster had been arrested in connection with two outstanding Ohio warrants: one for felonious assault and one for misdemeanor assault. Both had taken place at a mental health facility. According to a public records search, the felony assault involved punching a man hard enough to break his jaw in two places; the misdemeanor involved striking a fellow patient multiple times in the head and choking him from behind.

At the hospital, Webster got into a physical confrontation with the security guard and Deputy Miller. Miller was "taken to the ground." R. 31-4, PID 354. The confrontation left both Webster and an officer injured. Once he was cleared to leave the hospital, Deputy Sheriff Vaske arrived to take Webster to the jail.

Deputy Miller did not provide any information about the altercation to Deputy Vaske. Vaske knew that Webster had an Ohio warrant out for his arrest and expected the warrant information would be faxed from the dispatcher to the jail once the warrant was confirmed.

Deputy Vaske arrived at the jail with Webster a little after 2:00am. At that point, Webster was cooperative and calm, having barely spoken the trip from St. Elizabeth. Because his knee was sore, Vaske went in and obtained a wheelchair for Webster.

Vaske either brought a uniform citation for Webster with him or told the booking staff that one had been faxed over. The uniform citation noted that Webster was a fugitive with two open warrants from Ohio for assault and additional Kentucky charges for menacing and resisting arrest as a result of the incident at the hospital. A printout from NCIC detailing the Ohio charges was faxed over before Vaske and Webster arrived. The NCIC readout noted that he was charged with "Fel Assault F2" and also indicated "Violent Tendencies."

Deputy Sterling was on duty when Webster arrived. Although Sterling did not remember Webster's booking process, she stated that she would have reviewed all of the information on the uniform citation as part of booking had it been delivered. She learned that Webster had a head injury that had required staples. The jail nurse determined that Webster required medical observation. Webster also expressed suicidal ideations. Sterling thus placed Webster into suicide watch in a "High Risk" cell, Cell 323, by himself. The reason she indicated for the cell placement was "Medical observation;" she made no note about any assaultive history. On the initial booking questionnaire, she indicated that he answered that he had been to jail before, in Ohio, for assault. She also noted that Webster had received the head injury while with the police. Although she placed Webster into a "High Risk" cell, she neglected to select the appropriate category from the drop-down menu in the computer system to alter Webster's status from the default "pre-classification" to "High-Risk." She continued updating Webster's booking information at around 3:30am.

At around 5:00am, Sterling further updated the jail computer system. Deputy Miller completed his report regarding the hospital incident at around 4:30am, and it may have been delivered to the jail around this time. Sterling updated the JailTracker system, used to keep information about inmate backgrounds, with information regarding Webster's four charges but she did not change Webster's classification (nor did she correct his classification in the drop-down menu). Her shift was over at 7:00am.

While Sergeant Gunkel was on shift at 7:45am, he noticed that Webster was not classified as "High Risk" but was nevertheless housed in a "High Risk" cell. He therefore changed Webster's status in the computer from "Pre-classification" to "High Risk." According to Gunkel, when moving a detainee, the officer making the movement would check the JailTracker database to consult the appropriate booking classification and charging information. Gunkel testified, however, that because he was merely updating Webster's classification in the computer, and because Webster was not approaching the 72-hour mark, he did not consult JailTracker. In any event, because Webster was on suicide watch, he would not have been able to move Webster until he was cleared. When Gunkel finished his shift, Webster was still alone in Cell 323 on suicide watch.

Webster was cleared from suicide watch and medical observation by jail medical staff a little after 5:00pm. Sergeant Berry thus changed Webster's booking classification from "High Risk" to "Detox." Berry then moved Webster to Cell 331, where Webster joined Stein.

Berry could not remember the circumstances of moving Webster, but he stated that he would have relied on Webster's booking classification in determining what to review to move Webster. Because Webster's file indicated that he was "High Risk"—because he needed medical evaluation and was a suicide risk—Berry stated that he would have relied on that initial classification and moved him after the medical team cleared him, without reviewing any additional information regarding Webster's charges and the circumstances of his arrest.

## D.

By the time Webster was placed in the same cell as Stein, neither had been at the facility for 24 hours. Jail staff placed some additional detainees in with Webster and Stein.

Later that evening, a Sergeant and Deputy on patrol heard someone kicking the door of Webster and Stein's cell. They arrived to find another occupant of the cell, Mark Kelley, yelling that there was a fight.

The officers entered and found Webster on top of Stein, beating him. According to Kelley, Webster had been calm, but then attacked a sleeping Stein without provocation. After

removing a resisting Webster, the officers escorted Stein to medical and then to the hospital for evaluation.  Stein sustained injuries to his head and suffered a broken finger.

After the beating, a note was added to Webster's initial classification noting the altercation and stating that: "Inmate Webster has a violent history as well as mental health issues.  During arrest inmate Webster was involved in a fight with the officer resulting in the officer needing stitches."  Officers then classified Webster as maximum restricted movement, meaning that he was housed by himself and had to be moved by two deputies while in restraints.

E.

In November 2019, Stein filed this suit against Sergeant Gunkel and Deputies Sterling, Kaitlyn Thomas, and Grant Morton in their individual capacities for damages pursuant to 42 U.S.C. § 1983, alleging that the officers violated the Fourteenth Amendment for failing to protect him from the risk of harm Webster posed.  Following discovery, Stein voluntarily dismissed claims against Thomas and Morton.

The remaining two defendants, Gunkel and Sterling, moved for summary judgment. After briefing but before the district court decided the motion, this court decided *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).  The parties filed supplemental briefing, and the district court granted summary judgment on November 2, 2021.  *Stein v. Gunkel*, Civ. No.19-159, 2021 WL 5098685 (E.D. Ky. Nov. 2, 2021).  The district court analyzed the failure-to-protect claim under *Brawner* and concluded that Stein had failed to establish a violation.  See *id.* at *3.  It also determined that the law was not clearly established, as *Brawner* constituted a sufficient change in the law such that pre-*Brawner* caselaw could not clearly establish a deliberate indifference claim analyzed under the new test.  See *id.* at *4.  Thus, summary judgment was also supported on the alternate ground that Sterling and Gunkel were owed qualified immunity.  *Id.* at *6.  This timely appeal followed.

II.

We review the district court's grant of summary judgment de novo.  *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015).  Summary judgment is properly granted if the record "shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the factual evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." *Burwell v. City of Lansing*, 7 F.4th 456, 462 (6th Cir. 2021) (quotation omitted).

Stein sues under 42 U.S.C. § 1983, alleging that defendants Deputy Sterling and Sergeant Gunkel were deliberately indifferent to a serious risk of harm by failing to protect him from Jordan Webster. Stein is a pretrial detainee, and as such is protected from deliberate indifference to a substantial risk of serious harm by the Fourteenth Amendment. *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016).

During the pendency of this litigation, the standard that this circuit applies to a pretrial detainee's claim of deliberate indifference changed. We previously analyzed pretrial detainees' deliberate indifference claims under the standard applied in *Farmer v. Brennan*, 511 U.S. 825, 828 (1994), to Eighth Amendment claims brought by convicted prisoners. *Farmer* requires that a prisoner prove both that there was an objective risk of serious harm and that a defendant official subjectively knew of and disregarded that risk. *Id.* at 834, 837. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), held that a pretrial detainee bringing an excessive force claim under the Fourteenth Amendment against several jail officers need not show that "the officers were subjectively aware that their use of force was unreasonable"; instead, the detainee could show that "the officers' use of that force was objectively unreasonable," *id.* at 392–93. After *Kingsley*, this court altered the test for a pretrial detainee alleging that jail officials were deliberately indifferent to medical needs. *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), *reh'g en banc denied*, 18 F.4th 551 (6th Cir. 2021). Recognizing that *Brawner* changed the applicable test for a deliberate-indifference claim brought by a pretrial detainee, the district court analyzed Stein's failure-to-protect claim under the *Brawner* test. *Stein*, 2021 WL 5098685, at *3. Since the district court's decision, we have applied *Brawner* to a deliberate-indifference claim for failure to protect. *See Westmoreland v. Butler County*, 29 F.4th 721, 729 (6th Cir. 2022), *reh'g en banc denied*, --- F.4th ---, 2022 WL 1799126 (6th Cir. June 2, 2022).

Under *Westmoreland*, to establish deliberate indifference for failure to protect, "a defendant officer must [1] act intentionally in a manner that [2] puts the plaintiff at a substantial

risk of harm, [3] without taking reasonable steps to abate that risk, [4] and by failing to do so actually cause the plaintiff's injuries." *Id.* at 729.

Even assuming Stein can satisfy the first two elements, his case falters at the third *Westmoreland* element. The third element requires more than negligence because "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 576 U.S. at 396 (emphasis omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Thus, to establish the third element, Stein must prove that each officer "was more than merely negligent; the officer must have acted with 'reckless disregard' in the face of 'an unjustifiably high risk of harm.'" *Westmoreland*, 29 F.4th at 730 (quoting *Brawner*, 14 F.4th at 596).

Stein fails to do so. We are required to analyze each defendant individually. *See Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022).

*Sergeant Gunkel*. Throughout the entirety of Gunkel's shift, both Stein and Webster were housed alone, on suicide watch. Stein nevertheless maintains that Gunkel, as shift supervisor, was responsible for conducting additional due diligence at the time of this reclassification. As Stein notes, classification is never final. Under his theory, then, Gunkel should have proactively reviewed Webster's records and determined that his violent history justified housing Webster alone independently of his medical needs.

But it is difficult to see how Gunkel's actions could be objectively reckless when he *elevated* Webster's classification on the computer and otherwise followed jail procedures. Ordinarily, he would not have taken any special action regarding Webster—Webster was not close to the 72-hour mark requiring security classification, nor had any additional reason presented itself that would have triggered Gunkel to reconsider Webster's booking classification. Gunkel was also not the shift supervisor when Sterling made her classification, so he had no responsibility to review her classification. Simply put, a reasonable official would have taken the same action as Gunkel in this circumstance. *See Westmoreland*, 29 F.4th at 730. Gunkel therefore did not recklessly disregard the risk Webster posed to Stein.

*Deputy Sterling*. Stein similarly cannot show that Deputy Sterling's actions rise above mere negligence, if even that. *See Westmoreland*, 29 F.4th at 728. He argues that Sterling's decision to place Webster into a high-risk cell for medical observation because of suicide risk—rather than to keep him separate from others because of his assaultive history—led to Sterling's colleagues placing him with other detainees once the jail medical team cleared him. But while Sterling placed Webster into the cell for medical observation, she also accurately included information about Webster's charges in the JailTracker. And "[w]ith the benefit of hindsight, it is easy to say that" Sterling should have included an explicit flag that Webster needed to be housed alone because of his violent history. *Greene*, 22 F.4th at 614. Sterling's failure to do so, however, "at most . . . amounts only to negligence." *Id.* (citation omitted). She worked in booking, which required her to make quick judgments about temporary classifications for incoming detainees, rather than a long-term housing assignment or security classification. And she reasonably relied on the conclusion of jail medical staff that Webster needed medical observation. *See, e.g.*, *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017) (concluding, in the medical needs context, that "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" (internal quotation omitted)). The full narrative of Webster's arrests and charging information indicated a propensity to violence, and Stein's injuries may have been avoided had Sterling included an alternate justification to house him alone. But Sterling placed Webster in a cell by himself, the same action that would have occurred had she determined that he was likely to assault a fellow inmate. Sterling's actions were not reckless. *See Westmoreland*, 29 F.4th at 729.

### III.

Because Stein does not establish that either Sterling or Gunkel violated his constitutional rights, we AFFIRM.