# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2673

JONATHAN DiFRAIA,
Appellant

v.

KEVIN RANSOM, SUPERINTENDENT; JASEN BOHINSKI,
DEPUTY SUPERINTENDENT FOR CENTRALIZED SERVICES; DR.
TIMOTHY KROSS; WAYNE INNISS, CORRECTIONS
CLASSIFICATION PROGRAM MANAGER; RAWLINGS, DRUG
AND ALCOHOL TREATMENT SPECIALIST, et al.

_____

On Appeal from the U.S. District Court, M.D. Pa.
Judge Jennifer P. Wilson, No. 1:23-cv-01187

Before: BIBAS, PORTER, and BOVE, *Circuit Judges*
Argued Jan. 27, 2026; Filed Mar. 31, 2026

_____

OPINION OF THE COURT

BIBAS, *Circuit Judge*. Cruel and unusual punishment, like intentional discrimination, requires not only a wrongful act but also a blameworthy mind. So prisoners may not use either the Eighth Amendment or the Americans with Disabilities Act to challenge prison officials' good-faith judgments about medical treatment. Yet that is just what prisoner Jonathan DiFraia tries

to do. As a drug addict, he got medication as part of his prison's drug-treatment program. But after officials accused him of diverting his medication to other prisoners, they kicked him out of the program. Nothing in the record suggests that they meant to (or were even reckless about) exposing DiFraia to more harm, or that they disciplined him *because of* his drug addiction. So the District Court properly dismissed both federal claims. In dismissing DiFraia's state-law negligence claim, though, it relied on circuit precedent that has since been abrogated. We will thus AFFIRM the dismissal of DiFraia's two federal claims, VACATE the dismissal of the negligence claim, and REMAND.

## I. SUSPECTED OF DIVERTING MEDICATION, DiFRAIA IS PHASED OUT OF DRUG TREATMENT

DiFraia is a Pennsylvania state prisoner. As an opioid addict, he was approved for medication to help control his drug cravings. Medications like methadone and buprenorphine allay an addict's cravings without creating a high, reducing the risk of relapse. DiFraia was prescribed and got Suboxone, a brand of buprenorphine. The prison made Suboxone available as part of a Medication Assisted Treatment program, which offered prisoners "long-term care strategies of medication management and continued monitoring" to help control their addictions. Pa. Dep't of Corr., Medication Assisted Treatment (MAT) [https://perma.cc/Y9FF-NZ2J] (last accessed Mar. 3, 2026); *see also* App. 4 n.2.

These medications are themselves opioids, so prisons with treatment programs typically do not let prisoners consume them alone. Rather, prisons administer them in medication

2

lines or the like. One day, while in the medication line, DiFraia was strip-searched and found to have contraband: an e-cigarette with a cap on it. Guards accused him of using the cap to divert (smuggle) the medication to other prisoners and wrote him up for contraband, though DiFraia denied the charge.

A week later, DiFraia was once again in the medication line. That time, after consuming his dose of Suboxone, he was again written up for having contraband and diverting his medication. He denied the allegation once more. Three days later, he met with Dr. Timothy Kross. Dr. Kross told him that he was being "removed from" the program for diversion. App. 31.

Rather than force DiFraia to go off Suboxone cold turkey—which would have triggered withdrawal—Dr. Kross gradually tapered DiFraia's doses over the next week. Even so, DiFraia soon suffered withdrawal symptoms, causing him to "pick[] [at his] arms," leaving scars. *Id.* at 32. His mental health also suffered. He wrote to the superintendent and other prison officials asking to be put back on Suboxone, but they refused. DiFraia was told that he "did not have to actually be caught diverting to be considered a diverter," limiting his access to Suboxone. *Id.* at 31.

In response, DiFraia sued Dr. Kross, the superintendent, and various other prison officials. His pro se complaint alleges violations of the Eighth Amendment, the Americans with Disabilities Act, and the "Tort Acts." App. 32. We review de novo, construing his pro se complaint liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam); *Vorchheimer v. Phila. Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018).

## II. DiFraia Fails to State an Eighth Amendment Claim

DiFraia charges the doctor and prison officials with violating the Eighth Amendment by being "deliberat[ely] indifferen[t] to [his] medical needs." App. 32. Read liberally, his pro se complaint seeks relief under 42 U.S.C. § 1983. Yet it fails to state a claim.

### A. Historically, the Eighth Amendment banned intentional sentences, not prison conditions

The Eighth Amendment bars "cruel and unusual punishments." At the Founding, "the word 'punishment' referred to the penalty imposed for the commission of a crime." *Helling v. McKinney*, 509 U.S. 25, 38 (1993) (Thomas, J., dissenting) (citing five dictionaries from the Founding era through the early nineteenth century). The term "cruel" meant "horrid modes" of abuse, such as "the rack or the stake." *Baze v. Rees*, 553 U.S. 35, 98 (Thomas, J., concurring in the judgment) (quoting James A. Bayard, *A Brief Exposition of the Constitution of the United States* 154 (2d ed. 1840)). And the amendment used "unusual" in the sense of "contrary to [long] usage" or without "precedent." *Harmelin v. Michigan*, 501 U.S. 957, 974 (1991) (opinion of Scalia, J.); *see also* John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1767, 1810–15 (2008).

So the Eighth Amendment was about choices at sentencing. It cabined the power of judges and juries to intentionally inflict horribly painful sentences that were outside "the bounds of [the] common-law tradition." *Id.* (both sources); *see also*

4

*Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (Reed, J., plurality opinion). Examples included "[b]reaking on the wheel, flaying alive, rending asunder with horses, … maiming, mutilating and scourging to death." Benjamin L. Oliver, *The Rights of an American Citizen* 186 (1832).

And the amendment prevented decisionmakers from substituting cruelty when ordinary punishments were unavailable. For instance, shortly before the English Bill of Rights, the King's Bench sentenced perjurer and Protestant cleric Titus Oates to be defrocked, pilloried, whipped, and imprisoned for life because it could not sentence him to death. *See Harmelin*, 501 U.S. at 969–73 (opinion of Scalia, J.). In response to those sorts of grotesque excesses, Parliament (and later, the Framers of the Constitution) checked judges' and juries' retributive impulses. *Helling*, 509 U.S. at 38, 40 (Thomas, J., dissenting). But the Eighth Amendment did not "encompass a prisoner's injuries that b[ore] no relation to his sentence," such as those from "prison deprivations." *Id.* It was addressed to judges and juries, not jailers. And it sought to curb intentional cruelty, not neglected prisons.

**B. The Eighth Amendment's history still shapes its modern limits**

Half a century ago, the Supreme Court expanded the Eighth Amendment beyond its original bailiwick. In *Estelle v. Gamble*, the Court reasoned that a prison's failure to give prisoners needed medical treatment could lead to "physical torture or a lingering death," akin to the barbaric, outdated punishments targeted by the Eighth Amendment. 429 U.S. 97, 103 (1976) (internal quotation marks omitted). So the Court held that the

5

government's deliberate failure to provide medical care is tantamount to cruel and unusual punishment when it "wanton[ly] inflict[s] … unnecessary pain." *Id.* at 105. The Court later extended *Estelle* to prison conditions more broadly. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

*Estelle* was a doctrinal innovation. It stretched what counted as punishment past suffering that was both authorized by a sentence and grounded in a judge or jury's subjective intent to inflict pain. Even so, *Estelle* retained the Eighth Amendment's historic tie to subjective blameworthiness in an important respect. Prison conditions do not violate the Eighth Amendment unless officials have "acted with *deliberate* indifference to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (internal quotation marks omitted, emphasis added). All too often, courts focus just on the noun "indifference" at the expense of the adjective "deliberate." *See generally Brawner v. Scott County*, 18 F.4th 551, 555–56 (6th Cir. 2021) (Readler, J., dissenting from denial of rehearing en banc). But the adjective remains a crucial link between the Eighth Amendment's original meaning and how we continue to apply it.

The adjective keeps the Eighth Amendment's mental standard subjective, not objective. *But cf. Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017) (applying objective mental standard to prisoner risk of suicide). Negligence, even gross negligence, is not enough. *See Farmer v. Brennan*, 511 U.S. 825, 835–37 & n.4 (1994). A prison official must be at least subjectively reckless. That means he "must consciously disregard a substantial risk of serious harm" to the prisoner. *Id.* at 839 (cleaned up) (quoting the Model Penal Code's definition

of recklessness). He must both be aware of the relevant facts and actually "draw the inference" that the prisoner faces such a risk. *Id.* at 837. If the official is not even conscious of the facts or the risk, his neglect cannot amount to punishment.

*Estelle*'s noun—indifference—further limits what kind of behavior violates the Eighth Amendment. Indifference requires more than just making the wrong judgment call or failing to prevent harm. And in the specific context of prison medical care, it is not enough that a prisoner or another doctor would prefer a different approach than the one corrections officials took. "[M]ere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990). "There may, for example, be several acceptable ways to treat an illness." *Id.* "For better or worse, prisoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, or even very good." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1277 (11th Cir. 2020) (cleaned up). And sometimes keeping an eye on a problem without doing more is a reasonable choice.

In short, even as expanded by the Court, the Eighth Amendment does not create a general constitutional tort of prison negligence. It requires subjective blameworthiness as well as serious mistreatment or neglect.

## C. DiFraia fails to plead serious neglect or mistreatment

Against that backdrop, we consider DiFraia's claim. To plead that deficient medical care violated the Eighth Amendment, a prisoner must make both "an objective showing that [his medical] needs were serious" and "a subjective showing that the defendants were deliberately indifferent to [those]

7

medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (cleaned up). We assume without deciding that, as an opioid addict, DiFraia had medical needs that were objectively serious. *Cf. Foelker v. Outagamie County*, 394 F.3d 510, 511–13 (7th Cir. 2005) (concluding that a prisoner suffering from opioid withdrawals that caused him to hallucinate and defecate on the floor of his cell had objectively serious medical needs). But DiFraia does not come close to alleging deliberate indifference to those needs.

*1. Deliberate indifference requires serious neglect or mistreatment*. Deliberate indifference is a stringent standard. Typically, we have let medical-care claims proceed only when care was all but absent. For example, a jail with hundreds of inmates could be liable for having no psychiatric professionals on staff. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 761–63 (3d Cir. 1979). A prison could likewise be liable for refusing to let a sick prisoner get any medical help. *See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987).

Yet when a plaintiff alleges not "a complete denial of medical care" but "inadequate medical treatment," we have required him to plead more. *Pearson*, 850 F.3d at 535 (internal quotation marks omitted). For claims of inadequate medical care, we presume the treatment proper and require allegations "that it violates professional standards of care" in some extreme way. *Id.* That means more than "[m]ere medical malpractice." *White*, 897 F.2d at 108. For instance, one prison doctor could be sued for repeatedly withholding medications for epilepsy, an ear infection, hypertension, and severe boils, all of which other doctors had prescribed, despite having reason to believe

the prior prescriptions were the only realistic response. *Id.* at 110–11. In another case, we reinstated an Eighth Amendment claim because a prison lacked enough psychiatric staff, "kept poor medical records," ignored requests for counseling, refused to provide treatments apart from medication, did not check whether medications were effective, did not ensure frequent mental-health appointments, and did not train staff on how to respond to mentally ill prisoners. *Palakovic*, 854 F.3d at 216, 228.

DiFraia, though, argues for much broader liability. He says prisons may never deny medical care unless they base their denial on "individualized medical judgment." Appellant's Br. 15. For support, he relies on our court's statement that "delay[ing] necessary medical treatment based on a non-medical reason" can count as deliberate indifference. *Id.* at 37 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (Alito, J.)). But he ignores a key word in that statement: necessary. An official risks violating the Eighth Amendment if he invokes non-medical reasons to delay or deny care that is medically necessary. It is not enough that a treatment might make a prisoner's life easier.

Our precedents, as well as persuasive authority from our sister circuits, drive that point home. Courts have found Eighth Amendment violations, for example, when officials "intended to inflict pain on prisoners without any medical justification." *White*, 897 F.2d at 109 (responding to prisoner's complaint that he could not feel his hands by burning them with a lit book of matches). Relatedly, prison guards may not retaliate against a prisoner by denying essential medical care. *See Durham v.*

*Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (refusal to treat prisoner's severe back pain because prison staff disliked his "penchant for complaining" and "descri[bed] him as an 'a\*\*hole'"); *Hartsfield v. Colburn*, 371 F.3d 454, 456–57 (8th Cir. 2004) (delay of critical dental care because prisoner was "threatening and argumentative"); *Archer v. Dutcher*, 733 F.2d 14, 17 (2d Cir. 1984) (letting Eighth Amendment claim go to jury when prison officials refused to take pregnant, bleeding prisoner to hospital because she was "obstreperous and a disciplinary problem").

Courts have also found Eighth Amendment violations when officials denied care based solely on its cost, without making any effort to minimize harm. In one case, there was evidence that a doctor delayed a stroke victim's therapy for more than four months because of its cost. *Durmer v. O'Carroll*, 991 F.2d 64, 68 & n.10 (3d Cir. 1993). In another circuit, a prison refused to provide eye surgery because it had decided that "one eye is good enough for prison inmates." *Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014); *see also id.* at 1084 (Bybee, J., dissenting) (flagging cost constraints on providing cataract surgery). Still another refused to treat hepatitis C in prisoners nearing the end of their sentences, when the doctor admitted "there may not have been any real medical reason" for the policy "other than to keep it simple for folks." *Roe v. Elyea*, 631 F.3d 843, 863 & n.17 (7th Cir. 2011). So far from banning all non-medical considerations, courts forbid only retaliation, deliberately inflicting pain or harm, and refusing to treat at all based solely on cost.

*2. DiFraia's allegations do not plausibly add up to deliberate indifference*. Those standards are not met here.

10

According to the complaint, at first prison staff treated DiFraia's opioid addiction with Suboxone. Then "Dr. Kross … told [DiFraia that he] was being removed from [Medically Assisted Treatment] Suboxone for diversion." App. 31. But the doctor did not force him to go cold turkey. Instead, he gave DiFraia a "[t]aper[ed] [dose] of 7 days," which would wean him off the medication and possibly alleviate his eventual withdrawal symptoms. *Id.* So DiFraia had some treatment for his opioid addiction. And even after the tapered doses ended, DiFraia never alleges that he sought or was refused other forms of medical care.

Those facts distinguish this case from the ones discussed above. This case is not about retaliation, intentional infliction of harm, or a refusal to spend. Instead, DiFraia simply disagrees with Dr. Kross's decision to take him off Suboxone. He never alleges that Dr. Kross (or anyone else) concluded that Suboxone was necessary to manage his addiction. In fact, addiction can be treated in many ways, including medically supervised cold-turkey detoxification or medications to control cravings. Absent allegations that prison officials strayed well beyond the range of reasonable options, the judiciary may not second-guess "mere disagreements over medical judgment." *White*, 897 F.2d at 110. Indeed, we have "specifically held that there is no constitutional right to methadone" for a prisoner addicted to heroin. *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 (3d Cir. 1979) (per curiam). That holding spikes DiFraia's suggestion that each prisoner has a right to particular addiction treatments absent an individualized medical judgment precluding an alternative course of treatment.

11

*3. Any suggestion that the diversion finding was pretextual is implausible.* One sentence in DiFraia's complaint comes closer to stating a constitutional violation: the allegation that he was "removed from medication for disciplinary sanctions." App. 32. By that, DiFraia might mean that even if he was diverting Suboxone, cutting off his supply was retaliatory and thus deliberately indifferent. That argument is a nonstarter, since DiFraia never alleged that officials had judged that Suboxone was medically necessary to treating his addiction. And even if he had, diverting medication suggests that one no longer needs it; prison officials cannot be deliberately indifferent to a medical need that no longer exists.

More likely, however, DiFraia is trying to allege that he was not in fact diverting Suboxone, so the finding was a pretext. App. 31 (alleging that the e-cigarette "was not altered or being utilized for nefarious means"). In theory, DiFraia could suggest that prison officials falsely accused him of diversion to trigger excruciating withdrawals to punish him for some other, undisclosed transgression. If true, that could indeed amount to deliberate indifference under our precedents.

Yet nothing in the complaint supports an inference that the diversion finding was a pretext for punishing DiFraia. He alleges no history of mistreatment or run-ins with the guards who manned the medication line. Nor does he allege that Dr. Kross or the guards harbored any ill will. Indeed, the idea that Dr. Kross wanted to hurt him is belied by the doctor's decision to taper DiFraia's dose over seven days, rather than cut him off cold turkey. So the suggestion of pretext is implausible, and we need not assume that it is true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009). From the allegations in the complaint, the

only plausible conclusion is that, after finding the e-cigarette on DiFraia, the guards genuinely believed that DiFraia was diverting his Suboxone. And Dr. Kross genuinely believed that DiFraia no longer needed it to manage his addiction but could be weaned and treated in other ways. Perhaps they were right; perhaps mistaken. But the Eighth Amendment does not ban mistakes, let alone judgment calls. That limit dooms DiFraia's deliberate-indifference claim.

### III.   DiFraia Fails to Allege Causation as Required by the ADA

DiFraia also claims that the Americans with Disabilities Act bars taking even a medication diverter off Suboxone. The relevant provision of Title II bars a public entity from discriminating against or excluding a "qualified" disabled person from its programs or services "by reason of such disability." 42 U.S.C. § 12132. We construe DiFraia's pro se complaint liberally as referring to this section and as naming the defendants in their official capacities. *Contra* App. 11–13 (reading the complaint as limited to the defendants' individual capacities). *Cf. Montanez v. Price*, 154 F.4th 127, 145 (3d Cir. 2025) (construing Title II as not allowing suits against prison officials and doctors in their individual capacities). The Act abrogates state sovereign immunity and so authorizes suits for money damages in some situations. *Durham*, 82 F.4th at 228. But we need not decide whether this is such a situation, because DiFraia's claim fails for another reason: causation.

We assume that DiFraia is a qualified person, that his opioid addiction is a disability, and that he was excluded from the prison's Medically Assisted Treatment program. But he must

13

also show that his disability was a but-for cause of his being kicked out of that program. *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235–36 (3d Cir. 2013). And this is where DiFraia stumbles—he cannot show causation. He was kicked out of the treatment program not "by reason of" his addiction, but *despite* it. 42 U.S.C. § 12132. The program exists to treat addicts, not exclude them. DiFraia's allegations offer no hint that he was kicked out of a program designed to treat prisoners with a specific condition *because* he has the very condition that warrants being in the program.

A hypothetical may illustrate the point. Imagine two identical alcoholics in the same rehab program: Adam and Bert. While in rehab, Adam is accused of assaulting Charlie and gets kicked out. Bert, who is not accused of assaulting anyone, stays in the program with Charlie, David, Eddie, and all the other recovering alcoholics. Though Adam's addiction explains why he was in rehab in the first place, it has nothing to do with why he was kicked out of it; the sole cause of that was his alleged assault. (That is true whether he actually assaulted Charlie or was falsely accused, as DiFraia claims he was.) So too here.

Resisting this conclusion, DiFraia relies on one of our cases, *Furgess v. Pennsylvania Department of Corrections*, 933 F.3d 285, 291 (3d Cir. 2019). In *Furgess*, a disabled prisoner misbehaved and was put into disciplinary confinement, where none of the showers were handicapped-accessible. The prison said that there was no causation, claiming that the prisoner had lost the ability to shower only because he had misbehaved, not because he was disabled. *Id.* We rejected that claim, reasoning that "[a] prisoner's misconduct does not strip him of his right to reasonable accommodations." *Id.*

14

*Furgess*, though, is distinguishable. In that case, the prisoner faced worse conditions than other prisoners in disciplinary confinement—he was locked up with no usable shower, while they were locked up with showers that they could use. His disability, not his misbehavior, is what prevented him from showering. Here, though, the cause is not disability but diversion. Consider what would happen to a non-addicted prisoner caught diverting some other controlled medication: Nothing in the complaint suggests that such a prisoner would not also have that medication cut off, facing the same discipline. Both the addict and non-addict wrongdoers would experience the same result, and it has nothing to do with disability. By contrast, in *Furgess*, the results for the disabled and non-disabled wrongdoers differed, and did so because of disability.

DiFraia also cites district-court cases about prisons that denied all Suboxone-like medications to opioid-addicted prisoners. *See, e.g.*, *Smith v. Aroostook County*, 376 F. Supp. 3d 146, 159 (D. Me. 2019) (finding that such a policy treated opioid-addicted prisoners differently and that refusing to offer exceptions to the policy was a failure to provide a reasonable accommodation). But district-court cases do not bind us. And in any event, this prison *did* give medication to addicted prisoners, just not to those accused of diverting their medication.

Nor did the prison deny DiFraia a reasonable accommodation by refusing to reinstate his Suboxone. As DiFraia sees it, providing Suboxone to an opioid-addicted prisoner is a "reasonable accommodation to allow meaningful access to carceral healthcare." Appellant's Br. 26; *see* 42 U.S.C. § 12131(2) (referring to "reasonable modifications to rules, policies, or practices"); *Berardelli v. Allied Servs. Inst. of Rehab. Med*.,

15

900 F.3d 104, 116 (3d Cir. 2018) (noting that Title II's use of the term "reasonable modifications" tracks other provisions of the Act referring to "reasonable accommodations"). But that claim conflates a method of treating a disability with an accommodation: DiFraia never alleged that he could not receive any prison healthcare for his addiction because he was not getting Suboxone. So DiFraia's reasonable-accommodations argument just repackages his complaint that he was not given the treatment he desired. But "failure to provide adequate medical care to a disabled inmate does not, on its own, give rise to liability under the ADA." *Montanez*, 154 F.4th at 147.

In sum, the prison officials denied DiFraia Suboxone *despite* his alleged disability, not "by reason of" it. That denial does not violate the Act.

## IV.   DIFRAIA'S NEGLIGENCE CLAIM MAY PROCEED

Last, DiFraia alleges a claim under the "Tort Acts," claiming that "the Doctor and Prison officials were negligent." App. 32. After noting that the Federal Tort Claims Act does not apply to state prisons, the District Court read this as a state-law negligence claim and dismissed it because he failed to include a signed doctor's certificate as required by Pennsylvania law. *See* Pa. R. Civ. P. 1042.3.

Under Pennsylvania law, medical-malpractice plaintiffs must file a "certificate of merit" within sixty days of suing. A doctor must certify that there is a "reasonable probability" that the medical treatment complained of "fell outside acceptable professional standards" and "was a cause in bringing about the harm." *Id.* 1042.3(a)(1). The Federal Rules impose no such requirement.

16

Our precedent applied Pennsylvania's rule to state-law medical-malpractice claims brought in federal court. *Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 264–65 (3d Cir. 2011). But the Supreme Court just abrogated that precedent, holding that Delaware's analogous requirement did not apply in federal court. *Berk v. Choy*, 607 U.S. ___, 146 S. Ct. 546, 557 (2026). Because the District Court dismissed the state-law negligence claim under *Liggon-Redding* without otherwise passing on it, we will vacate and remand to let it address that claim's merits in the first instance.

\* \* \* \* \*

Prisoners do not get all the medical care that they want. Even if they suffer because prison officials deny them care, that alone is not enough to violate the Eighth Amendment or the Americans with Disabilities Act. We will thus AFFIRM the dismissal of those two federal claims, VACATE the dismissal of the state-law negligence claim, and REMAND.

*Counsel for Appellant*
Joseph Longley            [Argued]
Jennifer Wedekind
AMERICAN CIVIL LIBERTIES UNION

Sarah B. Bellos
Matthew A. Feldman
PENNSYLVANIA INSTITUTIONAL LAW PROJECT

*Counsel for Commonwealth Appellees*
Kathleen A. Wilde LaBay   [Argued]
PENNSYLVANIA ATTORNEY GENERAL'S OFFICE
*Counsel for Dr. Kross*

Samuel H. Foreman
Benjamin M. Lombard     [Argued]
WEBER GALLAGHER SIMPSON STAPLETON FIRES &
NEWBY

*Counsel for Amicus Curiae Addiction Medicine Specialists*
James P. Davy
ALL RISE TRIAL & APPELLATE

*Counsel for Amicus Curiae Former Corrections Officials*
Russell H. Falconer
GIBSON DUNN & CRUTCHER LLP